SHANE D. HILLMAN (8194)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
E-mail: shillman@parsonsbehle.com

RICHARD S. KRUMHOLZ (*Pro Hac Vice*)
Texas Bar No. 00784425
KRISTIN R. TURNER (*Pro Hac Vice*)
Texas Bar No. 24049549
REBECCA O. MILNE (*Pro Hac Vice*)
Texas Bar No. 24056904
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile:  (214) 855-8200
E-mail: rkrumholz@fulbright.com
E-mail: kturner@fulbright.com
E-mail: rmilne@fulbright.com

Attorneys for Defendants JPMorgan Chase Bank,
N.A., individually and as Administrative Agent,
Bank of America, N.A., KeyBank, National
Association, Regions Bank, Bank of the West,
Union Bank of California, N.A., Comerica Bank,
SunTrust Bank, Compass Bank, and First
Commercial Bank, New York Agency

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| EZRA K. NILSON, *et al.*<br><br>     Plaintiffs,<br><br>vs.<br><br>JPMORGAN CHASE BANK, N.A., | **DECLARATION OF GEORGE W. "BUZZ" WELCH IN SUPPORT OF JPMORGAN CHASE BANK, N.A.'S MOTION FOR PRELIMINARY INJUNCTION** |

85299388.4

| Individually and as Administrative Agent, *et al.*, | Case No. 1:09-cv-00121-DAK-BCW |
|---|---|
| Defendants. | Judge Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

GEORGE W. "BUZZ" WELCH, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury the following:

1.      I am Senior Vice President of JPMorgan Chase Bank, N.A. ("JPMorgan"), a position which carries responsibilities that I have had since January 17, 1995. In this capacity, I was involved in negotiating the terms of both the Senior Credit Agreement and the Subordination Agreement (each defined below), and have overseen JPMorgan's relationship with Pleasant Hill Investments, LC ("Pleasant Hill" or "Borrower"), Woodside Group, LLC ("Woodside") and various of their affiliates (collectively, the "Woodside Group"). In that regard, since May of 2006, I have had significant day-to-day interaction with Woodside and its principals.

2.      I submit this declaration (the "Declaration") in connection with JPMorgan's *Motion For Preliminary Injunction* (the "Motion For Preliminary Injunction") [Dkt. No. 6] and in response to *Plaintiffs' Opposition To Defendants' Motion For Preliminary Injunction* (the "Opposition") [Dkt. No. 37] filed by Ezra Nilson, Scott Nelson and Leonard Arave, individually and, as applicable, as Trustees of the Jessica Nilson Trust, the Joy Nilson Trust, the Benjamin Ezra Nilson Trust, the Brett Nilson Trust, the Abby Nilson Trust, and the Nellie Joe Nilson Trust (collectively, the "Plaintiffs" or "Shareholders").

3.      Except as otherwise stated below, all of the facts and information set forth herein are based upon my own personal knowledge. If called to testify, I would testify as follows:

## GENERAL BACKGROUND INFORMATION

4.      Woodside Group operated as one of the largest privately held homebuilding companies in the United States.  Woodside is the parent company of multiple subsidiaries, and through approximately 183 of those subsidiaries (the "Restricted Subsidiaries"), was primarily engaged in homebuilding operations in eight states, including Texas, Arizona, California, Florida, Minnesota, Nevada, Maryland and Utah.  Approximately 95% of Woodside's shares are held by the Company's three senior officers and managers, Mr. Ezra Nilson, Mr. Len Arave, and Mr. Scott Nelson, and their various relatives and related trusts.

5.      The operations of Woodside Group are financed through Woodside's affiliate, Pleasant Hill.  Accordingly, on May 5, 2006, JPMorgan, as Administrative Agent for various lenders (the "Senior Lenders"),[1] and Pleasant Hill entered into a certain Senior Credit Agreement (the "Senior Credit Agreement"), pursuant to which, among other things, the Senior Lenders agreed to make revolving loans available to Pleasant Hill in an aggregate amount not to exceed $620 million.  *See* Exhibit 1.[2]  Under the Senior Credit Agreement, repayment of loans and credit extended to Pleasant Hill by the Senior Lenders was guaranteed by Woodside.

6.      At the time the Senior Credit Agreement was entered into, it was anticipated that the Plaintiffs might attempt to make certain distributions to themselves, to their relatives, and to their family trusts.  Therefore, in order to induce the Senior Lenders to enter into the Senior Credit Agreement, Woodside and various of its subsidiaries executed the Continuing Standstill

---

[1] The Senior Lenders under the Senior Credit Agreement are: JPMorgan Chase Bank, N.A.; Bank of America, N.A.; U.S. Bank National Association; Washington Mutual Bank; Wachovia Bank, National Association; Bank of The West; Guaranty Bank; Union Bank of California, N.A.; First Commercial Bank, New York Agency; SunTrust Bank; Comerica Bank; AmSouth Bank; Compass Bank; Wells Fargo Bank, National Association; and KeyBank NA.
[2] All references to Exhibits cited herein refer to those exhibits identified on JPMorgan's Exhibit and Witness List filed on November 11, 2009.

And Subordination Agreement (the "Subordination Agreement"), dated May 5, 2006. *See* Exhibit 2. Pursuant to the Subordination Agreement, Woodside Group was allowed to make certain "Permitted Payments" to Plaintiffs, but only if certain terms and conditions were met.

## THE SENIOR CREDIT AGREEMENT

7.      Per the terms of the Senior Credit Agreement, Pleasant Hill's authority to obtain credit by submitting borrowing requests was contingent upon its compliance with various covenants, and the amounts that could be borrowed were limited by certain "Borrowing Base" formulas.

8.      In particular, Section 6.1(a) of the Senior Credit Agreement[3] expressly provides that "[t]he members of the Borrowing Group will not create, incur, assume or permit to exist any Debt, except: (a) Senior Unsecured Debt; provided, however, (i) at no time shall the Senior Unsecured Debt exceed the Borrowing Base . . . ." Accordingly, to ensure compliance with Section 6.1(a), the Borrower was required to apply the advance rates applicable to Eligible Assets in accordance with Section 2.20.2 of the Senior Credit Agreement, and then apply the various Borrowing Base limitations contained in Sections 2.20.3 through 2.20.9.[4]

9.      Section 2.20.10 of the Senior Credit Agreement further illustrates the Borrower's sole obligation and duty to correctly calculate the Borrowing Base. Section 2.20.10 provides:

> The Borrowing Base will be established and determined as of each Borrowing Base Valuation Date based upon each Borrowing Base Certificate delivered pursuant to Section 5.1.6 and, unless approved by the Administrative Agent and Lenders, the Borrower will not be permitted to increase the Borrowing Base other

---

[3] Article 6 of the Senior Credit Agreement lists various negative covenants.

[4] Thus, the Borrower was required to take into account Section 2.20.9 of the Senior Credit Agreement, entitled "Other Limitations," which provides in subpart (a) that "[a]t no time shall the sum of the Borrowing Base value attributable to Entitled Land, Lots Under Development and Finished Lots exceed sixty percent (60%) of the entire Borrowing Base at the time of determination." Section 2.20.9(a) is referred to herein as the "60% Limitation."

than pursuant to such reports delivered pursuant to Section 5.1.6; provided, however, once during any calendar month, Borrower may revise the value of the Borrowing Base as a result of changes in the Eligible Assets included (or to be included) in the Borrowing Base since the Borrowing Base Certificate provided for the immediately prior month and, in connection therewith, provide to Administrative Agent an Interim Borrowing Base Certificate. . . .

10.    Section 5.1.6 of the Senior Credit Agreement similarly provides:[5]

Until the Commitments have expired or been terminated and the principal of and interest on each Loan . . . shall have been paid in full . . . the members of the Borrowing Group covenant and agree with the Lenders that . . . [t]he members of the Borrowing Group will furnish, or will cause to be furnished, to the Administrative Agent and each Lender . . . [a]s soon as available, but in any event within twenty (20) days after the end of each month, a Borrowing Base Certificate reflecting the Borrowing Base as of the end of such month, and with any request to revise the Borrowing Base as of a date other than the last day of a month pursuant to Section 2.20.10, an Interim Borrowing Base Certificate.

11.    Based on the above, once the Borrowing Base and Available Commitment were calculated and determined by the Borrower, the Borrower was required to provide to JPMorgan a monthly Borrowing Base Certificate, "substantially in the form of Exhibit E" attached to the Senior Credit Agreement, that certified that (a) all information contained in the Borrowing Base and Inventory Report was true and correct and calculated in accordance with the terms of the Senior Credit Agreement; (b) Borrower was in compliance with all covenants set forth in the Senior Credit Agreement; (c) no Event of Default existed under the Senior Credit Agreement; and (d) all representations and warranties were true and correct in all material respects.

12.    Thus, Exhibit E, as attached to the Senior Credit Agreement, was intended to serve merely as a form to aid the Borrower in fulfilling its duties and obligations under the Senior Credit Agreement. *See* Exhibit 16. Exhibit E was never intended to override the express terms of the Senior Credit Agreement, and the fact that Exhibit E did not contain a specific line-

---

[5]  Article 5 of the Senior Credit Agreement lists various affirmative covenants.

item demonstrating a separate calculation of the 60% Limitation did not somehow excuse the Borrower from performing that calculation or certifying its compliance with this limitation. That any Borrowing Base Certificate in substantially the same form as that reflected in Exhibit E would have been sufficient if the Borrowing Base certified therein had been correctly calculated in accordance with the terms of the Senior Credit Agreement confirms this conclusion. In other words, Exhibit E was only intended to convey the end result. Thus, if the Borrower was in compliance with the 60% Limitation, Exhibit E would have been sufficient in and of itself.

13.    Accordingly, it was always my belief that the monthly Borrowing Base Certificates submitted by the Borrower took into account all limitations as required by the Senior Credit Agreement, and I relied on these Borrowing Base Certificates as permitted by Sections 8.3 and 8.4 of the Senior Credit Agreement,[6] and took, at face value, the Borrower's certifications that they were in compliance with all loan covenants thereunder.

14.    Based on the above, I do not believe that any person at JPMorgan had the responsibility or obligation to perform any analysis as to whether the Borrowing Base calculations, as certified by the Borrower in the Borrowing Base Certificates, complied with the obligations under the loan documents. Similarly, I do not believe that any person at JPMorgan

---

[6]    Section 8.3 of the Senior Credit Agreement is the only provision which describes the Agent's duties. In particular, Section 8.3 of the Senior Credit Agreement provides that "[t]he Administrative Agent [*i.e.*, JPMorgan] shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate [*i.e.*, a Borrowing Base Certificate], report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in ARTICLE 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent." Senior Credit Agreement at § 8.3; *see also id.* at § 8.4 (providing that the Agent "shall be entitled to rely upon, and shall not incur any liability for relying upon, any . . . certificate [*i.e.*, a Borrowing Base Certificate] . . . believed by it, in good faith, to be genuine and to have been signed or sent by the proper Person").

had the responsibility to verify the same. Rather, JPMorgan was entitled to, and did in fact, rely on Woodside's certifications included in their Borrowing Base Certificates.[7]

## CALCULATING THE BORROWING BASE AND THE AVAILABLE COMMITMENT

15.    The Borrower's Available Commitment (as defined in the Senior Credit Agreement) was tied to, among other things, the Borrowing Base (*i.e.*, the allocable value of Eligible Assets) as of the most recent Borrowing Base Valuation Date (*i.e.*, the last day of each preceding month). Thus, to calculate the Borrowing Base to determine the Available Commitment, the Borrower was required to apply the following advance rates and limitations:

| Eligible Asset | Advance Rate |
| --- | --- |
| Escrow Proceeds Receivables | 100% |
| Pre-Sold Units | 90% of Cost |
| Spec Units | 80% of Cost (subject to the limitations in Section 2.20.3 of the Senior Credit Agreement)[8] |
| Model Units | 80% of Cost (subject to the limitations in Section 2.20.4 of the Senior Credit Agreement)[9] |
| Finished Lots | 70% of Cost (subject to the limitations in Section 2.20.5 of the Senior Credit Agreement)[10] |

---

[7]  A credit banker for JPMorgan would typically receive the Borrowing Base Certificates from the Borrower to assist in the management of the credit facility. Credit bankers were to look at the Borrowing Base Certificates for a signed certification that it was true and correct. Additionally, loan disbursers would typically receive a copy of the Borrowing Base Certificates. The loan disburser would then take the information provided by the Borrower and update the Borrower's Available Commitment in JPMorgan's computer system based solely on the information provided in the certificate.

[8] Section 2.20.3, entitled "Limitations on Spec Units," provides:
  (a)    The advance rate for any Spec Unit shall decrease to fifty percent (50%) after one hundred eighty (180) days have passed from the date such Housing Unit was Completed.
  (b)    The advance rate for any Spec Unit shall decrease to zero percent (0%) after 360 days have passed from the date such Housing Unit was Completed.

[9] Section 2.20.4, entitled "Limitations on Model Units," provides:
  The advance rate for any Model Unit shall decrease to zero percent (0%) after one hundred eighty (180) days have passed from the date the final Housing Unit (other than another Model Unit) in the Subdivision in which such Model Unit is located has been sold (whether or not actually transferred) to a third party purchaser.

| Lots Under Development | 65% of Cost (subject to the limitations in Section 2.20.6 of the Senior Credit Agreement)[11] |
|---|---|
| Entitled Land | 50% of Cost (subject to the limitations in Section 2.20.7 of the Senior Credit Agreement)[12] |

16.     Of particular importance, as I mentioned above, it was the Borrower who was required to take into account the 60% Limitation contained in Section 2.20.9 of the Senior Credit Agreement.

17.     Notwithstanding the advance rates and other limitations described above, it is my understanding that Mr. Len Arave, through his deposition testimony provided on October 15, 2009, has argued that there are four ways to calculate the Borrowing Base – two of which are "probably reasonable." *See* Exhibit 108 at 107:10-19.   A review of these two calculations suggested by Mr. Arave clearly reveals that there is only one proper method of calculating the Borrowing Base that takes into account the 60% Limitation at issue in this proceeding.

18.     In particular, to properly calculate the Borrowing Base to account for the 60% Limitation, one must first determine the <u>maximum</u> amount of the Borrowing Base. This calculation is shown by the following formula:

---

[10] Section 2.20.5, entitled "Limitations on Finished Lots," provides:
      The advance rate for any Finished Lot shall decrease to zero percent (0%) after twenty-four (24) months have passed from the date such Finished Lot was added to the Borrowing Base.
[11]  Section 2.20.6, entitled "Limitations on Lots Under Development," provides:
      The advance rate for any Lot Under Development shall decrease to zero percent (0%) after twenty-four (24) months have passed from the date such Lot Under Development was added to the Borrowing Base.
[12] Section 2.20.7, entitled "Limitations on Entitled Land," provides:
      (a)     The advance rate for any Entitled Land shall decrease to zero percent (0%) after twelve (12) months have passed from the date such Entitled Land was added to the Borrowing Base.
      (b)     At no time shall the Borrowing Base value of Entitled Land exceed twenty percent (20%) of the entire Borrowing Base at the time of determination.

X    =    (100% of Escrow Proceeds Receivables + 90% of Cost of Pre-Sold
            Units + 80% of Cost of Spec Units + 80% of Cost of Model Units
            − Indirect Costs and Interest Elimination) ÷ .4

19.    The formula described in the preceding paragraph utilizes the Borrowing Base

values attributed by the Borrower to the "vertical" or non-land categories of Eligible Assets on a

given Borrowing Base Certificate as establishing 40% of the maximum Borrowing Base that

would be permissible after giving effect to the 60% Limitation, and then algebraically calculates

the 100% number for the maximum Borrowing Base by dividing the total value of these non-

land categories by .40.  The value of these "vertical" or non-land categories is then deducted

from the calculated maximum Borrowing Base to determine the maximum amount of the total

Borrowing Base that can be attributed to the three "land" categories of assets that are subject to

the 60% Limitation.

20.    The forgoing calculation is the only method in my opinion that adequately takes

into account the 60% Limitation.

21.    The second calculation relied upon by Mr. Arave (as evidenced by Exhibit 9 to

Mr. Arave's deposition) takes the advance rates set forth in Section 2.20 of the Senior Credit

Agreement into account solely with respect to the Finished Lots, Lots Under Development, and

Entitled Land, and then divides that amount by the <u>total cost</u> of all assets.  *See* Exhibit 108.

22.    Nothing in the Senior Credit Agreement suggests that this is an appropriate

method of calculating the Borrowing Base, and I have never seen a Borrowing Base calculated in

this manner in my experience with JPMorgan.

23.    Interestingly, the Plaintiffs themselves apparently never believed that this second

calculation of the Borrowing Base was appropriate; otherwise, they would not have admitted

pursuant to the Forbearance Agreements (described below) that an Event of Default had occurred as of the date of those agreements. After all, if this second calculation was in fact a reasonable and widely-accepted method of calculating the Borrowing Base, the Plaintiffs would have been well within the 60% Limitation.

24.    Despite these facts, the Plaintiffs have claimed that this second calculation was contained in JPMorgan's October 2, 2007 credit approval package for Woodside. However, the credit approval package relied upon by the Plaintiffs as support for this unorthodox and inappropriate Borrowing Base calculation contains a calculation error, and was never circulated for final approval within JPMorgan, and was pulled immediately once the calculation error was recognized. Moreover, this credit approval package was a document prepared solely for JPMorgan's internal use, and it was never provided to the Plaintiffs except in connection with this litigation.[13] Further, the obvious nature of this calculation error by JPMorgan in its internal documents is evidenced by the fact that page CAP-8 (JPM 2004-0013707) of the October 2, 2007 credit approval package – the same page which contains the calculation error – provides the correct calculation for the December 31, 2006 60% Limitation assessment.

25.    Finally, any calculation error made by JPMorgan is irrelevant given that Sections 8.3 and 8.4 of the Senior Credit Agreement make it clear that JPMorgan had no duty or obligation to calculate the Borrowing Base or to verify the correctness of the Borrower's calculations. Specifically, Section 8.3 of the Senior Credit Agreement (as described above) provides that JPMorgan had no duty or obligation to inquire into the truth or correctness of any

---

[13]    Credit approval packages are typically generated for internal use when underwriting a new loan request, or when extending an existing loan facility. These credit approval packages discuss the risk associated with the particular credit facility, and are typically routed through a lengthy internal approval process.

of the Borrower's representations and certifications. Likewise, under Section 8.4 of the Senior Credit Agreement, the parties stipulated that JPMorgan would be entitled to rely upon the various certificates provided by the Borrower as well as the representations contained therein.

### SUBMISSION AND REVISION
### OF BORROWING BASE CERTIFICATES

26.     Under the Senior Credit Agreement, the Borrower's ability to borrow, and the Lenders' obligation to lend, was explicitly limited by the amount of the Borrower's Borrowing Base, which in turn was established by the Borrowing Base Certificates prepared and delivered by the Borrower in compliance with all of the restrictions and limitations set out in Section 2.20 of the Senior Credit Agreement. Because of the central importance of the Borrowing Base to the operation of the credit facility governed by the Senior Credit Agreement, and the role of the Borrowing Base Certificates in establishing and revising the Borrowing Base, the parties stipulated the required frequency and timing pursuant to which the Borrowing Base could be revised through the Borrower's Borrowing Base Certificates or Interim Borrowing Base Certificates.

27.     Specifically, pursuant to Section 5.1.6 of the Senior Credit Agreement, the members of the Borrowing Group covenanted and agreed, as one of their affirmative covenants, that they would furnish to JPMorgan Chase, as Administrative Agent, on a monthly basis "a Borrowing Base Certificate reflecting the Borrowing Base as of the end of such [prior] month," and, in the event the Borrower were to exercise its right to do so once within a given month, an "Interim Borrowing Certificate" reflecting any request by the Borrower "to revise the Borrowing Base as of a date other than the last day of a month." The parties stipulated in Section 5.1.6 that these monthly Borrowing Base Certificates and any Interim Borrowing Base Certificates would

be provided "as soon as available, but in any event within twenty (20) days after the end of each month."

28.     This requirement that Borrowing Base Certificates, and any Interim Borrowing Base Certificates, be provided on a monthly basis was necessary given that the parties had stipulated, in Section 2.20.10 of the Senior Credit Agreement, that the Borrowing Base would be "established and determined as of each Borrowing Base Valuation Date based upon each Borrowing Base Certificate delivered pursuant to Section 5.1.6," and, in the definition section of the Senior Credit Agreement, had defined the term "Borrowing Base Valuation Date" as being "the last day of each month" following April 15, 2006, except that in the event "Borrower elects to deliver an Interim Borrowing Base Certificate in any month pursuant to Section 2.20.10," the parties stipulated that "the Borrowing Base Valuation Date for the purposes of such Interim Borrowing Base Certificate shall be the Business Day immediately preceding the date of such certificate."

29.     As is apparent from the provisions of the Senior Credit Agreement quoted above, the Borrower had no flexibility as to the timing of providing Borrowing Base Certificates. They had to be provided monthly, by no later than the 20th day of the month, and had to properly calculate the Borrowing Base as of the last day of the preceding month. Similarly, while the Borrower could elect to provide an Interim Borrowing Base Certificate, the Borrower could do so only once per month, and was required to provide any such Interim Borrowing Base Certificate on the same time schedule applicable to the monthly Borrowing Base Certificate, *i.e.*, by no later than the 20th day of the month, with the Borrowing Base Valuation Date of the Interim Borrowing Base Certificate being "the Business Day immediately preceding the date of

such certificate." Taken together, these provisions of the Senior Credit Agreement strictly limited the ability of a Borrower to revise the Borrowing Base to a minimum of once per month (pursuant to a monthly Borrowing Base Certificate), and a maximum of twice per month (in those months in which the Borrower elected to provide an Interim Borrowing Base Certificate in addition to the contemporaneously-delivered monthly Borrowing Base Certificate). The Senior Credit Agreement did not permit the Borrower to revise the Borrowing Base in any other manner, or with any other frequency or timing.

30.    The strict limitations that the Senior Credit Agreement provided regarding the frequency and timing of the Borrower's establishment of the Borrowing Base necessarily imposed practical limitations on the information that would be available to the Borrower for use in timely providing Borrowing Base Certificates, and any Interim Borrowing Base Certificates, by no later than the twentieth of each month. The Senior Credit Agreement contains no provision for subsequent "true ups" of information contained in previously-furnished Borrowing Base Certificates or Interim Borrowing Base Certificates based on the Borrower's subsequent acquisition of new or revised cost or asset information. The Senior Credit Agreement makes it clear that the parties did not contemplate that the Borrowing Base as established and revised by a given Borrowing Base Certificate or Interim Borrowing Base Certificate could ever be altered or revised except by the Borrower's furnishing of a Borrowing Base Certificate or Interim Borrowing Base certificate for the next month.

31.    I understand that the Plaintiffs have claimed that issues relating to the timing of commencement of their Defaults under the Senior Credit Agreement should be determined in light of calculations that have recently been prepared by their retained expert who purports to

rely on new cost information ostensibly applicable to the Borrowing Base Valuation Dates covered by the Borrowing Base Certificates and Interim Borrowing Base Certificates that the Borrower furnished to JPMorgan Chase with Borrowing Base Valuation Dates of December 2006 through August 2007. For the reasons described in the preceding paragraphs, this type of approach cannot be squared with the agreement of the parties, as set out in their Senior Credit Agreement, regarding the exclusive means by which the Borrowing Base was to be established, the exclusive methods by which the Borrowing Base could be revised, as well as the mandatory procedures that the Borrower had to follow in order to accomplish any such revisions. As a consequence, any attempt to utilize this type of approach to retroactively alter the Borrower's prior establishment of the Borrowing Base through timely-provided Borrowing Base Certificates would be completely ineffective under the Senior Credit Agreement.

## DEFAULTS UNDER THE SENIOR CREDIT AGREEMENT

32.     I first became aware of an Event of Default under the Senior Credit Agreement in October 2007. In September of the same year, weeks before I learned of any default, Mr. Arave asked JPMorgan to consider allowing land assets that had aged off the Borrowing Base to be brought back on to increase the Available Commitment. After JPMorgan reviewed the request, it became apparent that the Borrowing Base submitted by Woodside to JPMorgan in August 2007 was incorrect. Specifically, Woodside was not in compliance with the 60% Limitation as required under the Senior Credit Agreement. In particular, Mary Darnell, the credit banker, discovered that there was an overadvance position that flowed through the Borrowing Base Certificate in August of 2007, and that the Borrower had made borrowings in excess of the

Borrowing Base for that month. Upon further analysis of this situation, JPMorgan became aware of other instances of Woodside's noncompliance with the Senior Credit Agreement.

33.    In particular, after discovering that an Event of Default had occurred under the Senior Credit Agreement as of the August 2007 Borrowing Base Certificate, Mary Darnell prepared an internal spreadsheet, the Pleasant Hill Investments Historical Land Base Calculation, that calculated the maximum possible Borrowing Base from October 31, 2006 through August 31, 2007. *See* Exhibit 20, a true and correct copy of which is attached hereto as Exhibit A. The Pleasant Hill Investments Historical Land Base Calculation also reflects the Borrower's total Available Commitment and the amounts that the Borrower was overdrawn through August 2007.

34.    Upon my further review of the Borrower's Borrowing Base Certificates, I learned that an Event of Default occurred as early as November 2006 when Mr. Len Arave, in his capacity as CFO and Manager of Pleasant Hill, signed the November 30, 2006 Borrowing Base Certificate and certified to JPMorgan that the amount of the "Total Allowable Borrowing" was "true and correct" and had been "calculated in accordance with the definitions as required in the [Senior Credit] Agreement."

35.    Specifically, the Borrower represented that the Total Eligible Borrowing was $799,253,262. Had the Borrower properly taken into account the 60% Limitation as required under the Senior Credit Agreement, the Total Eligible Borrowing would have been reduced by approximately $15 million, equaling $784,252,698. Thus, notwithstanding that the Borrower's misrepresentation of the Total Eligible Borrowing was not accompanied by an actual over-borrowing for the month in question, the mere overstatement by the Borrower of the Total Eligible Borrowing constituted an Event of Default under Section 7.1.3 of the Senior Credit

Agreement.[14]  These misrepresentations continued through September 2007.[15]

36.    Based on my review of the various Borrowing Base Certificates and my own subsequent analysis, in January 2007 additional Events of Default occurred under the Senior Credit Agreement when Pleasant Hill began to draw into the over-advancement.  In particular, as of January 31, 2007, the Borrower was approximately $78 million overdrawn under the Available Commitment.  Thus, as of January 2007, the Senior Unsecured Debt exceeded the Borrowing Base in violation of Section 6.1(a).  This violation of the negative covenant contained in Section 6.1 resulted in an additional Event of Default under Section 7.1.4 of the Senior Credit Agreement.[16]   This over-advancement into the Available Commitment continued through September 2007.[17]

37.    In addition, following the expiration of the forbearance period in 2008, JPMorgan learned that Woodside and various of its affiliates had converted from S-Corporations (and/or

---

[14]  Section 7.1.3 of the Senior Credit Agreement provides that "[t]he occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") under this Agreement . . . [a]ny representation or warranty made or deemed made by or on behalf of a member of the Borrowing Group or any Restricted Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been materially incorrect when made or deemed made."  Significantly, by reason of the Borrowing Group's affirmative covenant in Section 5.2.1 of the Senior Credit Agreement, the Borrower was obligated to furnish "prompt written notice" to JPMorgan and each of the Lenders of the "occurrence of any Default."  Despite this affirmative covenant, the Borrowing Group never furnished the required prompt written notices of any of the multiple Defaults that resulted from their actions described in this declaration.

[15]  Because these misrepresentations resulted in an Event of Default, certifying that "No Event of Default exists . . ." was, in and of itself, also an Event of Default under Section 7.1.3 of the Senior Credit Agreement.

[16]  Section 7.1.4 of the Senior Credit Agreement provides that "[t]he occurrence of any one or more of the following events shall constitute an event of default . . . under this Agreement:  . . . A member of the Borrowing Group shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.3 or 5.4 (with respect to the Borrowing Group's existence) or 5.9 or in ARTICLE 6." (emphasis added).

[17]  Pleasant Hill's negative covenant violation in January 2007 also meant that other certifications made in the Borrowing Base Certificates, including that "Borrower is in compliance with all covenants set forth in the [Senior Credit Agreement]," were likewise not true.  The Borrowing Requests and Compliance Certificates submitted by Pleasant Hill to JPMorgan pursuant to the Senior Credit Agreement contained many of these same misrepresentations and inaccurate certifications.

Qualified S-Corporations, as the case may be) to LLCs (the "Tax Conversion"). This Tax Conversion was completed without informing JPMorgan, and without receiving JPMorgan's or the Senior Lenders' consent as required by the loan documents. *See* Senior Credit Agreement at §§ 5.4 (affirmative covenant), 6.3 (negative covenant). This constitutes an additional Event of Default under the Senior Credit Agreement. The Tax Conversion also triggered significant tax windfalls to various principals of Woodside, as described more fully below.

38.    As a result of these various Events of Default, JPMorgan was entitled to exercise its contractual remedies provided in Section 7.2 of the Senior Credit Agreement, including terminating the Commitments, and declaring the Loans then outstanding to be due and payable in whole or in part.

THE SUBORDINATION AGREEMENT

39.    As mentioned above, in connection with the execution of the Senior Credit Agreement, it was anticipated that certain insider Plaintiffs would make distributions to themselves and/or to their family trusts and other family members as they had done in the past. Accordingly, in contemplation of these potential distributions, on May 5, 2006, the Shareholders, along with certain other entities (collectively, the "Subordinated Lenders"), and JPMorgan entered into the Subordination Agreement.

40.    The Subordination Agreement, by its express terms, applies broadly to "all indebtedness and other obligations of every type and nature."[18] In particular, Section 1 of the

---

[18] I understand that the Plaintiffs have taken the position that the Subordination Agreement had nothing to do with dividends or with respect to the Shareholders' note obligations. This position is undermined by the plain language of the Subordination Agreement which explicitly references dividends. In particular, only "Permitted Payments" are authorized under the Subordination Agreement, and such "Permitted Payments" may only be made if no Event of Default exists. "Permitted Payments" means

Subordination Agreement provides:

> **Indebtedness and Liens Subordinated.**
> (a) Subordinated Lender subordinates all indebtedness and other obligations of every type and nature owed by the members of the Borrowing Group to Subordinated Lender, and now or at any time hereafter owing from any or all of the members of the Borrowing Group to Subordinated Lender . . . ("Subordinated Debt") to the prior payment in full in cash of all Specified Senior Debt (as defined below). Subject to the provisions of Section 2, Subordinated Lender irrevocably agrees and directs that all Specified Senior Debt shall be indefeasibly paid in full in cash prior to the members of the Borrowing Group making any payment on any Subordinated Debt, unless the Senior Lenders authorize such payments on the Subordinated Debt. . . .

41. Thus, the Subordination Agreement clearly governed the distribution of dividends to the Plaintiffs. In this regard, Woodside was permitted to make distributions to the Subordinated Lenders, and the Subordinated Lenders were permitted to accept such distributions,

---

(i) payments of accrued interest owing on the Subordinated Debt and (ii) payments (including prepayments) of principal, in each case solely out of monies which the members of the Borrowing Group are otherwise entitled to distribute to their respective members, partners or shareholders pursuant to Section 6.6 of the Senior Credit Agreement. The members of the Borrowing Group agree that each Permitted Payment made to Subordinated Lender shall reduce dollar for dollar the amount available for distribution to members, partners and shareholders of the members of the Borrowing Group pursuant to said Section 6.6.

*See* Subordination Agreement at § 2. Section 6.6 of the Senior Credit Agreement, entitled "Restricted Payments," provides:

The members of the Borrowing Group will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except (a) each member of the Borrowing Group may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its common stock, (b) Unrestricted Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, (c) each member of the Borrowing Group may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the members of the Borrowing Group, except as would otherwise cause a Change in Control, and (d) each member of the Borrowing Group may make Restricted Payments to the owners of Equity Interests in such member, so long as both before and after giving effect to each such distribution no Default or Event of Default shall occur and the members of the Borrowing Group shall continue to be in compliance with all of the financial covenants set forth in Section 5.3.

"Restricted Payments," in turn, means "any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in a member of the Borrowing Group, or any payment (whether in cash, securities or other property) . . . ." *See* Senior Credit Agreement at p. 20. Based on the forgoing language, I have always believed that the Subordination Agreement, as originally contemplated, covered all dividend payments.

only if certain terms and conditions were met.  In particular, Section 2 of the Subordination

Agreement provides as follows:

> **Restriction of Payment of Subordinated Debt, Disposition of Payments Received by Subordinated Lender**. The members of the [Woodside] Group will not make, and Subordinated Lender will not accept or receive, any payment or benefit in cash or otherwise (or exercise any right of, or permit any set-off with respect to, the Subordinated Debt), directly or indirectly, on account of any amounts owing on the Subordinated Debt, provided, however, the members of the [Woodside] Group may make, and Subordinated Lender may accept, Permitted Payments (hereinafter defined), if and only if at the time of each Permitted Payment and both before and after giving effect thereto (a) no Default or Event of Default under the Senior Credit Agreement shall have occurred and be continuing, and (b) the members of the [Woodside] Group will remain in compliance with the covenants set forth in Section 5.3 of the Senior Credit Agreement . . . .

42.    Based on the forgoing language, the occurrence of an Event of Default meant that

the Woodside Group could not make, and the Subordinated Lenders, could not receive, any

dividend distributions.  Upon the occurrence of such an Event of Default, the Subordinated

Lenders were required, pursuant to Section 3 of the Subordination Agreement, to immediately

pay and deliver all of the monies received in violation of Section 2 of the Subordination

Agreement to JPMorgan:

> **Delivery of Payments**.  In the event that notwithstanding this Agreement, any payment or distribution of assets of the members of the [Woodside] Group or any of their Subsidiaries of any kind or character, whether in cash, property, or securities, from any source whatsoever shall be received by Subordinated Lender contrary to the provisions of this Agreement, such payment or distribution shall be held in trust for the benefit of and shall be immediately paid or delivered (with all necessary endorsements) by such holder to the Administrative Agent, for application to the payment or prepayment of all such Specified Senior Debt remaining unpaid, to the extent necessary to pay all such Specified Senior Debt in full in cash after giving effect to any other concurrent payment or distribution to the Senior Lenders.

43.    I have learned through my review of the deposition testimony of several of the

Plaintiffs that, once dividends were declared at the Woodside/Pleasant Hill level, those dividends

were not paid immediately to the Shareholders. Rather, according to the deposition testimony of Len Arave, they were booked as dividends at the Woodside and Pleasant Hill level, and then were converted to a loan obligation at either Alameda or Liberty – two subsidiaries of Woodside. I was never aware of this method of paying dividends. Nevertheless, based in part on certain dealings that I had with Mr. Arave in 2006 in which he expressed an interest in changing the identity of the Borrower under the Senior Credit Agreement to gain certain perceived tax advantages, I believe that this complex method of paying these dividends or debt obligations was designed to avoid the restrictions of the Subordination Agreement.

44. Despite the Plaintiffs' efforts to avoid the Subordination Agreement, however, I believe that the express language of the Subordination Agreement nonetheless governs this web of inter-company transfers. In particular, as referenced above, Section 2 of the Subordination Agreement provides that "[t]he members of the Borrowing Group will not make, and Subordinated Lender will not accept or receive, <u>any payment or benefit</u> in cash or otherwise . . . <u>directly or indirectly,</u> on account of any amounts owing on the Subordinated Debt . . . ." The declaration of the dividend, and its subsequent conversion to a loan obligation at the Alameda and/or Liberty levels, amounted to – at the very least – an indirect transfer under the Subordination Agreement.

45. Accordingly, because the various inter-company transfers made within the Woodside Group did not change the nature or character of the dividends originally declared, any payments made to or for the benefit of the Shareholders, directly or indirectly, were subject to the Subordination Agreement. Because certain Events of Default occurred as early as November 2006 (as discussed above), the Subordinated Lenders were not entitled to receive any dividend

85299388.4

distributions thereafter. Moreover, to the extent any dividends were paid post-November 2006, those funds should have been held in trust pursuant to Section 3 of the Subordination Agreement. As a result, the Subordinated Lenders improperly received in excess of $60 million, described more fully below. *See* Exhibit 32 (spreadsheet of Woodside Group Ledger Entries/Information regarding dividend distributions).

46.    Finally, the Second Forbearance Agreement (as described below) contained a limited approval of certain dividend distributions. The inclusion of this provision in the Second Forbearance Agreement was of no particular concern to me for two reasons. First, at the time the Second Forbearance Agreement was executed, it was not anticipated that Woodside would incur any taxable income, and thus it was assumed that there would be no need to declare dividends for the purpose of making tax payments. Second, as is confirmed by the reference to dividends in the Second Forbearance Agreement, and the authorization of such dividends on a limited basis as provided therein, both parties effectively recognized in the Second Forbearance Agreement that any dividends that might be paid thereunder would fall under the Subordination Agreement, and therefore would be subject to the restrictions on payment, and potential repayment obligations, set out therein. After all, if all dividends were somehow exempted from both the Senior Credit Agreement and Subordination Agreement, why would there have been any need for the Borrower to seek explicit approval of certain dividends in the context of a forbearance agreement?

## JPMORGAN DID NOT WAIVE ANY OF ITS RIGHTS OR REMEDIES UNDER THE SENIOR CREDIT AGREEMENT AND SUBORDINATION AGREEMENT

47.    It is my understanding that the Plaintiffs have asserted that JPMorgan intentionally waived its rights with respect to the Events of Default described above (a) given

certain internal credit approval packages that were prepared by JPMorgan wherein JPMorgan (i) acknowledged that the Borrower had exceeded the 60% Limitation and (ii) acknowledged, albeit incorrectly, that the Borrower was in compliance with its various financial covenants as of the dates thereof; and (b) in light of JPMorgan's failure to discover the Events of Default until October 2007.

48.    As discussed above, however, Section 5.1.6 of the Senior Credit Agreement requires the Borrower (*i.e.*, Pleasant Hill), as one of its affirmative covenants, to submit monthly Borrowing Base Certificates to JPMorgan, as Administrative Agent.    In those monthly Borrowing Base Certificates, the Borrower represented that it had calculated the Available Commitment in compliance with the various requirements and restrictions contained in all of the subsections of Section 2.20 of the Senior Credit Agreement, and certified that (a) all information contained in the Borrowing Base and Inventory Report was true and correct and calculated in accordance with the definitions as required in the Senior Credit Agreement; (b) Borrower was in compliance with all covenants set forth in the Senior Credit Agreement; (c) no Event of Default existed under the Senior Credit Agreement; and (d) all representations and warranties were true and correct in all material respects.    Each of the Borrowing Base Certificates was signed by Len Arave, CFO and senior Manager of Woodside/Pleasant Hill, certifying compliance as to each of the covenants and representations referenced above, and as to the absence of any Event of Default.    Under the Senior Credit Agreement, each of these representations in the Borrowing Base Certificates was material, and in Section 7.1.3 of the Senior Credit Agreement, the parties stipulated that providing a Borrowing Base Certificate containing any materially incorrect representations would be an Event of Default.

49.    Viewed in this light, the internal credit approval documents that JPMorgan prepared do not indicate any intention to waive rights.  To the contrary, pursuant to Section 8.3 of the Senior Credit Agreement, the parties stipulated that absent its prior receipt of written notice from the Borrower of the occurrence of a Default, JPMorgan would be deemed not to have any knowledge of any Default, and that JPMorgan was not responsible for and had no duty to ascertain or inquire into the contents of any certificate delivered in connection with the Senior Credit Agreement.  Moreover, Section 8.4 of the Senior Credit Agreement expressly provided that JPMorgan was entitled to rely upon any certificate believed by it, in good faith, to be genuine and to have been signed or sent by the proper person.

50.    In addition, Section 9.2.1 of the Senior Credit, entitled "No Waiver of Rights," provides that "[n]o waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted Section 9.2.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given."  Section 9.2.2 likewise provides that "[n]either this Agreement nor any provision hereof may be waived . . . except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders . . . ."  Thus, in order for JPMorgan to waive any of its rights under the Senior Credit Agreement, JPMorgan was required to give the Borrower written notice thereof.  JPMorgan has never provided any such notice.[19]

---

[19]  *See* Senior Credit Agreement at § 9.2.1, providing:
> 9.2.1 No Waiver of Rights. No failure or delay by the Administrative Agent, the Issuing Bank or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the

51.    As previously mentioned, from the date of execution the Senior Credit Agreement and Subordination Agreement effective May 6, 2006, through at least the commencement of the related bankruptcy proceeding, I was the senior officer within JPMorgan with principal responsibility for dealing with the Borrowing Group, and with the Plaintiffs and affiliated parties who are the Subordinated Lender under the Subordination Agreement. Until October 2007, I had no knowledge that Events of Default had occurred under the Senior Credit Agreement by reason of the Borrower having borrowed amounts in excess of the Borrowing Base, and I have seen no evidence that suggests that any other employee of JPMorgan, or of any of the other Lenders, had any knowledge of the occurrence of any such Defaults prior to October 2007.

52.    At all times relevant to the matters discussed in this declaration, I had no authority to waive the 60% Limitation, or any other provision of the Senior Credit Agreement, or any provision of the Subordination Agreement, and I certainly did not make any such waiver. The only person within JPMorgan who would have had authority to make any such waiver would have been my immediate superior, and even then, under the Senior Credit Agreement, my immediate superior could not have purported to make any such waiver of rights or remedies without doing so in writing, and with the prior consent of the other Lenders, and no such consent of the other Lenders was ever sought or received, nor was any such written waiver ever given. In addition, I am unaware of any fact that would suggest that any such waiver was made either

---

Issuing Bank and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted Section 9.2.2,[19] and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

*See also* Subordination Agreement at §§ 6, 18 (providing for similar non-waiver of rights).

directly or by implication, and, in all events, I can confirm that no waiver could have occurred

unless explicitly given in writing in the manner used with respect to the two provisional waivers

that are part of the forbearance agreement discussed below.

53.    Based on the above, JPMorgan never had actual knowledge of an Event of

Default until October 2007 (and thus never intended to waive such default); JPMorgan was

neither required nor obligated under the Senior Credit Agreement to independently investigate

whether or not any potential defaults may have occurred; JPMorgan was entitled, under the

Senior Credit Agreement, to rely on the representations made in the Borrowing Base Certificates;

JPMorgan relied on the certifications made by the Borrower in its monthly Borrowing Base

Certificates; JPMorgan never provided the Borrower with any written notice of a waiver; and

both the Senior Credit Agreement and Subordination Agreement contain non-waiver provisions.

There was no intentional relinquishment by JPMorgan of its rights.

## THE FORBEARANCE AGREEMENTS

54.    Pleasant Hill, Woodside, JPMorgan and certain other parties (as identified

therein) entered into two forbearance agreements, the first dated as of October 24, 2007 (the

"First Forbearance Agreement"), and the second dated as of December 19, 2007 (the "Second

Forbearance Agreement") (collectively, the "Forbearance Agreements"). *See* Exhibits 4 and 5,

respectively.    Therein, the Borrower admitted its Events of Default under the Senior Credit

Agreement, and recognized the Administrative Agent's rights to enforce its remedies thereunder:

> Borrower has failed to comply with the covenants required under Sections
> 2.20.9(a) and 6.1(a) of the Credit Agreement. The foregoing constitute Defaults or
> Events of Default under the Credit Agreement, which potentially create defaults
> and events of defaults under other Obligations of the Borrowing Group and
> consequently cause an Event of Default under Section 7.1.7 of the Credit

Agreement (such Defaults and Events of Default are collectively referred to herein as the "Existing Defaults"), without any cure or grace periods.

As a result of the Existing Defaults, Administrative Agent and Lenders are entitled to, among other things, enforce their rights and remedies under the Credit Agreement and otherwise at law or equity, including, without limitation, the right to terminate the Commitments and accelerate the Obligations.

*See* Second Forbearance Agreement at ¶¶ C – D.

55.    Moreover, the Forbearance Agreements expressly did not waive any Events of Default.  To the contrary, the Defaults that occurred from November 2006 through the present were expressly preserved:

During the Forbearance Period, provided that no Forbearance Default occurs, (a) Administrative Agent and Lenders shall not exercise or enforce any remedy against any member of the Borrowing Group arising as a result of the Existing Defaults; and (b) Borrower's right to request and receive Borrowings and Letters of Credit shall not be terminated as a result of the Existing Defaults. Upon the first to occur of the Forbearance Expiration Date or any Forbearance Default, the Forbearance Period shall terminate and, in the event that the Existing Defaults have not been waived by the appropriate number of Lenders by such date, the Administrative Agent and Lenders shall be entitled to exercise all of their rights and remedies under the Credit Agreement or any other Credit Document.

*See* Second Forbearance Agreement at ¶ 6 (emphasis added).[20]

---

[20]  Paragraph 7 of the Second Forbearance Agreement contained similar "Provisional Waivers" with respect to the Borrowing Base:

During the Forbearance Period, the Administrative Agent and Lenders agree (a) to provisionally waive the requirement that the Borrowing Base value of Entitled Land, Lots Under Development and Finished Lots comply with Section 2.20.9(a) of the Credit Agreement . . . and (b) to provisionally waive the requirement that the Borrowing Base comply with Sections 2.20.5, 2.20.6, and 2.20.7(a), respectively, of the Credit Agreement . . . . For avoidance of doubt, the Borrowing Group acknowledges that, upon the occurrence of the termination or expiration of the Forbearance Period, (i) all provisional waivers set forth in Section 7 of this Agreement shall expire without the need for further action or notice, and (ii) each of the covenants and requirements that were provisionally waived shall be reinstated to full force and effect.  Nothing herein constitutes a waiver of the Existing Defaults, and Borrower and Guarantors acknowledge that Administrative Agent and Lenders have not committed to waive any of the Existing Defaults, or any other Defaults, nor shall Administrative Agent and Lenders be obligated to forbear from exercising any remedies with respect to the Existing Defaults following the expiration or termination of the Forbearance Period, or any other Defaults at any time. . . .

56.     Thus, not only did JPMorgan and the Lenders not waive any of their respective rights, the Borrower fully and completely released the Administrative Agent and each Lender from any and all potential liability.  These broad release provisions are found in Section 15 of the Second Forbearance Agreement, which provides:

> Borrower and each Guarantor fully, finally, and forever releases and discharges Administrative Agent, Issuing Bank, and each Lender and their successors, assigns, directors, officers, employees, agents, and representatives from any and all actions, causes of action, claims, debts, demands, liabilities, obligations, and suits, of whatever kind or nature, in law or equity, that Borrower or any Guarantor has or in the future may have, whether known or unknown in respect of the Loan, the Credit Documents, or the actions or omissions of Administrative Agent, Issuing Bank, and each Lender in respect of the Loan or the Credit Documents that arise from events occurring prior to the date of this Agreement.  It is the intention of Borrower and each Guarantor that the above release shall be effective as a full and final release of each and every matter specifically and generally referred to above.  Borrower and each Guarantor acknowledge and represent that it has been advised by independent legal counsel with respect to the agreements contained herein.

*See* ¶ 9(b) of First Forbearance Agreement; ¶ 15(b) of Second Forbearance Agreement.[21]

## PERSONAL GUARANTEES

57.     To determine the credit worthiness of the Borrower, and to determine whether or not a personal guaranty or some other form of security or collateralization was required in connection with the Senior Credit Agreement, JPMorgan utilizes a grading system or scale (the "Credit Scale") which represents the perceived credit risk of a particular borrower.  This Credit Scale considers multiple risk factors, including the amount and nature of security proposed and the industry involved.  Upon consideration of this multitude of factors, a credit grade (the "Loan Grade") is ultimately assigned to the borrower's risk profile.

---

[21]   The Borrower and each Guarantor likewise covenanted, represented, and warranted to the Bank Group that "[n]either Borrower nor any Guarantor has any claims, counterclaims, defenses, or set-offs with respect to the Obligations or the Credit Documents." *Id.* at ¶ 11(d).

58.    In connection with this credit facility, JPMorgan rated Woodside at a "5+" at the time the parties executed the Senior Credit Agreement and related loan documents. This Loan Grade, which was only one notch below what independent rating agencies would consider an investment grade rating,[22] justified structuring the credit facility on an unsecured basis with no personal guarantees. Thus, the lack of personal guarantees by the Plaintiffs represents nothing more than the fact that the Woodside Group was essentially investment grade rated at the time of the loan; JPMorgan never intended to relinquish any rights against the Plaintiffs.

## THE TAX REFUNDS AT ISSUE

59.    At the time of the negotiation of the credit documents, I understood that all of the shareholders of Woodside were subordinating their dividends received to facilitate their payment of taxes to their obligations owed under the Senior Credit Agreement to JPMorgan and the Senior Lenders.  In other words, under the Subordination Agreement, the declaration of a dividend or any other debt incurred would be subordinate to the credit facility under the Senior Credit Agreement, whether or not there was a default.  As an unsecured credit facility, it was vital that any other debt incurred would not compete with the Senior Lenders' unsecured debt – therefore, all debt (unless otherwise permitted in the loan documents), was required to be subordinate to the prior payment in full of debt owed under the Senior Credit Agreement.

60.    JPMorgan has learned that Plaintiffs are expecting to receive, or have already received, large tax refunds aggregating over $100 million (the "Tax Refunds").[23] These Tax

---

[22]  By way of example, a NAIC-2 rating and a BBB- rating by Standard & Poor's are investment grade ratings. These ratings would equate to a "4-" under JPMorgan's Credit Scale. JPMorgan adjusted Woodside's Loan Grade down to a "5+" (albeit near investment grade) in light of the fact that Woodside was in the home building industry and had requested an unsecured credit facility.

[23]  Under legislation passed by Congress on November 6, 2009, the loss "carryback" provisions of the Internal

Refunds will likely serve as the only funds that will enable Plaintiffs to satisfy any judgment in this case. These Tax Refunds directly relate to the Tax Conversion that was effectuated without JPMorgan's approval or consent in violation of the Senior Credit Agreement, and likewise represent the repayment of funds that were improperly distributed to the state and federal governments on behalf of Plaintiffs and in breach of the Subordination Agreement.

### NEED FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION

61.     JPMorgan and the Senior Lenders will suffer imminent, immediate and irreparable injury if Plaintiffs, and all acting in concert with them, including all heirs, legal representatives, successors and assigns, are not immediately restrained from disseminating, transferring or otherwise disposing of or spending the Tax Refunds.

62.     JPMorgan's irreparable harm is demonstrated by, among other things: (i) Plaintiffs' failure to deliver the wrongfully transferred funds to JPMorgan per the Subordination Agreement; (ii) Plaintiffs' failure to hold such funds in trust for JPMorgan and the Senior Lenders; (iii) Plaintiffs' failure to confirm that Plaintiffs will not disseminate or otherwise transfer the Tax Refunds pending resolution of this case; (iv) the instant action for declaratory relief, filed by Plaintiffs in response to JPMorgan's September 3, 2009 demand letter; and (v) the testimony of Mr. Nilson who has testified that he and the other shareholders are without sufficient capital to pay JPMorgan the amount wrongfully transferred to the Subordinated Lenders.

---

Revenue Code have been expanded from two years to five years, and the percentage of carryback has been increased for the most recent years. As a consequence, the Plaintiffs may be eligible to apply for tax refunds for years going back to 2004, which may result in the Plaintiffs being eligible to apply for tax refunds that I understand might exceed an additional $200 million.

63.     In addition, in connection with recent depositions, I have learned that Mr. Ezra Nilson and Mr. Len Arave are likely to venture into other business opportunities in the home building business following the October 30, 2009 confirmation of Woodside's plan of reorganization, as filed with the California Bankruptcy Court, and following the related termination of their employment with Woodside.   In fact, Mr. Nilson has already had several discussions with potential investors, and Messrs. Nilson and Arave have acknowledged that these opportunities could be implemented quickly, especially in the absence of a preliminary injunction.   Purchasing substantial assets with the Tax Refunds that have been and/or are expected to be received will undoubtedly irreparably harm JPMorgan, as this large cash source would be significantly depleted and no longer be available to satisfy any adverse judgment entered against the Plaintiffs.

64.     In light of the above, the continuing and threatened harm to JPMorgan clearly outweighs any harm that a preliminary injunction would cause to Plaintiffs.

65.     Issuance of a preliminary injunction would not adversely affect the public interest and would be in furtherance of public policy as JPMorgan is seeking injunctive relief only to preserve and protect rights that the parties have already agreed to in contract.   As stated above, Plaintiffs independently and freely agreed to the Subordination Agreement.   The public interest is served by this Court merely preserving the rights and obligations to which JP Morgan and the Plaintiffs have previously agreed.

DATED this 11th day of November 2009.

_____
GEORGE W. "BUZZ" WELCH

SUBSCRIBED and SWORN to before me this 11th day of November 2009.

_____
NOTARY PUBLIC

My Commission Expires:                    Residing at:

Feb 16, 2013                              Salt Lake City



KIMBERLY K. MERRILL
Notary Public
State of Utah
Comm. No. 577245
My Comm. Expires Feb 16, 2013

85299388.4