**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| EZRA K. NILSON, *et al.*, <br><br>       Plaintiffs, <br><br> vs. <br><br> JPMORGAN CHASE BANK, N.A., <br> Individually and as Administrative Agent, *et al.*, <br><br>       Defendants. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM DECISION AND ORDER GRANTING PRELIMINARY INJUNCTION** <br><br> Case No. 1:09-cv-00121 <br><br> Judge: Dale A. Kimball <br> Magistrate Judge:  Brooke C. Wells |

Before the court is the Motion for Preliminary Injunction filed by Defendant J.P. Morgan

Chase Bank, individually and as Administrative Agent for the Bank Group Defendants (JP

Morgan Chase Bank, Bank of America, Wachovia Bank, U.S. Bank National Association,

KeyBank, Regions Bank, Bank of the West, Union Bank of California, Wells Fargo Bank,

Comerica Bank, Sun Trust Bank, Compass Bank, and First Commercial Bank, New York

Agency) against Plaintiffs and Counterclaim Defendants Ezra K. Nilson, Scott Nelson, and

Leonard K. Arave, individually and as Trustee for the Jessica Nilson Trust, the Joy Nilson Trust,

the Benjamin Ezra Nilson Trust, the Brett Nilson Trust, the Abby Nilson Trust, and the Nellie

Joe Nilson Trust. [1]   Defendant JP Morgan's motion was joined in by U.S. Bank National

---

[1] During the Preliminary Injunction Hearing, Plaintiffs asserted that some of the Trust Plaintiffs were no longer in existence.  Counsel for Plaintiffs and counsel for Defendants, however, had previously stipulated for purposes of the Preliminary Injunction Hearing as to ownership interests with respect to each of the Plaintiffs, including the Trust Plaintiffs, in Woodside.  In light of the stipulation between the Parties, the Court finds that all of the above-captioned Plaintiffs are proper parties to this lawsuit, and each of the Plaintiffs' respective ownership interests are properly identified in Defendants' Exhibit BB.

Association, Wachovia Bank, N.A., and Wells Fargo Bank. The court held a hearing on the motion beginning on November 18, 2009, and continuing through November 20, 2009. At the conclusion of the hearing, the court took the matter under advisement and requested the parties to submit proposed findings of fact, conclusions of law, and a proposed form of order. Having received those submissions, and considering the evidence presented at the hearing, the arguments advanced in the briefing and at the hearing, and the law and facts relevant to the motion, the court makes the following findings of fact, conclusions of law, and issues the following memorandum decision and order granting Defendants' Motion for Preliminary Injunction.

## **Preliminary Injunction Standard**

Federal Rule of Civil Procedure 65 authorizes the issuance of a preliminary injunction. Fed. R. Civ. P. 65. "[T]he primary goal of a preliminary injunction is to preserve the pre-trial *status quo* . . . before a trial on the merits occurs." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (emphasis added).

In order to obtain a preliminary injunction, the movant must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Id.* (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)). The second factor, irreparable injury, may be satisfied if the movant shows a significant risk of irreparable harm. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250. 1258 (10th Cir. 2003) (holding that a party who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative). Moreover, if the movant has established the second, third, and fourth factors, a relaxed standard applies to the first factor.

*Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 652-53 (10th Cir. 2004) ("[W]here the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success' requirement is relaxed").

The Court notes that, in cases where a mandatory injunction is sought, a heightened pleading standard applies. *See generally O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *cert. granted*, 544 U.S. 973 (2005), *aff'd and remanded*, 546 U.S. 418 (2006). Here, however, the Bank Group has not asked this Court to require Plaintiffs to take any affirmative action with respect to the Tax Refunds that Plaintiffs already possess, nor has the Bank Group requested that this court prohibit Plaintiffs from receiving additional Tax Refunds. The Bank Group seeks only to preserve the Plaintiffs' current financial status, after receipt of all Tax Refunds, to ensure that they have sufficient funds to pay the Bank Group upon final adjudication. Plaintiffs testified that the current status is that the Tax Refunds have been deposited into an interest bearing investment account. Accordingly, the Court concludes that the heightened pleading standard applicable to mandatory injunctions does not apply.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that the court made rulings relevant to the motion on the record during the Preliminary Injunction Hearing, such rulings are incorporated by reference.

The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits. *University of*

*Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds by Systemcare, Inc. v. Wang Labs Corp.,* 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing.").[2]

## I.  FINDINGS OF FACT

### *A.*      **Factual and Procedural Background.**

#### (1)      **The Woodside Entities**

Woodside Group, LLC f/k/a Woodside Group, Inc. ("Woodside Group") and its affiliated entities (collectively, "Woodside") was founded by its principal, Ezra Nilson, in 1977.  Over time, Woodside grew into a major privately owned developer of residential real estate, with operations throughout the United States, including Texas, Arizona, Florida, Minnesota, Nevada, Maryland and Utah.  Exhibit KK at ¶ 7.  Approximately 95% of Woodside Group's shares are held by its three senior officers and managers, Mr. Ezra K. Nilson, Mr. Leonard ("Len") Arave, and Mr. Scott Nelson, and Mr. Nilson's relatives and related trusts.  *See* Exhibit BB.

#### (2)      **Woodside's Financing and Applicable Loan Documents**

The operations of Woodside are financed primarily through Woodside Group's affiliate, Pleasant Hill Investments, LC ("Pleasant Hill"), which operated as a "clearinghouse" for all of the Woodside entities.  Accordingly, on May 5, 2006, JPMorgan, as Administrative Agent for certain lenders (collectively, the "Bank Group"), and Pleasant Hill entered into a Senior Credit Agreement, pursuant to which, among other things, the Bank Group agreed to make revolving

---

[2] The Court notes that because this is a preliminary injunction proceeding, the Federal Rules of Evidence do not apply.  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003); *see also Pharmanex, Inc. v. HPF, LLC*, No. 99-4116, 2000 U.S. App. LEXIS 11952, *9 (10th Cir. April 20, 2000) (unpublished) (citing JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 65.23 (1999)) ("The Court can consider evidence outside the pleadings, including hearsay, when deciding whether to grant a preliminary injunction.").

loans available to Pleasant Hill in an aggregate amount not to exceed $620 million at that time (the "Revolving Loan").  The parties later agreed to increase the amount to $660 million.

Also at the time of entering into the Senior Credit Agreement, Woodside Group and various of its subsidiaries executed a Repayment Guaranty and a Continuing Standstill and Subordination Agreement (the "Subordination Agreement").  Pursuant to the Repayment Guaranty, Woodside Group and its various subsidiaries unconditionally guaranteed the entire amount of the Senior Credit Agreement.

Under the Subordination Agreement, the "Borrowing Group" was permitted to make distributions to the Subordinated Lenders only if certain terms and conditions were met, including principally that no Default or Event of Default existed and was continuing under the Senior Credit Agreement.[3]  *See* Exhibit B at § 2.  The Subordination Agreement defined the "Borrowing Group," to include Pleasant Hill, Woodside Group, and various other related entities as identified in an exhibit, Exhibit A, attached to the agreement.  The Subordination Agreement defined "Subordinated Lenders" to include, among others, the Plaintiffs in this action.

(3)   **Events of Default**

The Bank Group has asserted and the court finds that numerous Events of Default occurred under the Senior Credit Agreement.  Such Events of Default likely began with the submission of the November 2006 Borrowing Base Certificate, but no later than January 2007, and continued through September 2007.  These Events of Default occurred because Woodside

---

[3] While the Parties' interpretations of the various loan documents differ, no party has disputed the authenticity, validity and/or enforceability of the loan documents.  Accordingly, the court finds that the Senior Credit Agreement, the Subordination Agreement, and the other loan documents executed in connection therewith are valid, binding and enforceable agreements.

Group/Pleasant Hill did not take into consideration the 60% limitation with respect to calculating the allowable borrowing base under the Senior Credit Agreement, as discussed below.

Despite these defaults under the Senior Credit Agreement, Plaintiffs caused Woodside Group/Pleasant Hill to distribute over $60 million in dividends to or for the benefit of themselves, their family trusts, and other wholly controlled entities – all in violation of the Subordination Agreement.

The parties dispute when they each learned of these Events of Default given the information that was available to the different individuals involved.  The loan documents, however, place the burden of tracking the relevant information and the obligation of reporting an Event of Default on Woodside.  By October 2007, it is clear that all relevant parties were aware of the Events of Default.

       **(4)**       **Forbearance Agreements**

On October 24, 2007, after JPMorgan and the Bank Group learned of certain Events of Default, Pleasant Hill, Woodside Group and JPMorgan, among others, entered into a forbearance agreement (the "First Forbearance Agreement").  A second forbearance agreement was executed on December 19, 2007 (the "Second Forbearance Agreement") (collectively, the "Forbearance Agreements").

As provided in the Forbearance Agreements, Pleasant Hill admitted that certain Events of Default had occurred under the Senior Credit Agreement.  In particular, in the Forbearance Agreements, Pleasant Hill acknowledged:

> [Pleasant Hill] has failed to comply with the covenants required under Sections 2.20.9(a) and 6.1(a) of the [Senior] Credit Agreement.  The foregoing constitute Defaults or Events of Default under the [Senior] Credit Agreement, which potentially create defaults and events of defaults under other Obligations of the

> Borrowing Group and consequently cause an Event of Default under Section 7.1.7
> of the [Senior] Credit Agreement (such Defaults and Events of Default are
> collectively referred to herein as the "Existing Defaults"), without any cure or
> grace periods.

*See* Exhibits D & E at ¶ C. The Forbearance Agreements also confirmed that JPMorgan and the Bank Group were "entitled to, among other things, enforce their rights and remedies under the Senior Credit Agreement and otherwise at law or equity." *Id.* at ¶ D. The ability of JPMorgan and the Bank Group to enforce these rights and remedies was expressly preserved, and Pleasant Hill expressly and unequivocally released JPMorgan and each member of the Bank Group from any and all potential liability. *See* Exhibit D at ¶¶ 3, 9(b); Exhibit E at ¶¶ 7, 15(b).

**(5)      Voluntary Bankruptcy Filings**

On March 31, 2008, faced with deteriorating business conditions and defaults with various lenders, including the Bank Group, two Woodside Group affiliates, Woodside AMR 107, Inc. and Woodside Portofino, Inc., filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California, Riverside Division.

**(6)      Tax Conversion of Woodside Entities**

After the commencement of these bankruptcy cases, on July 25, 2008, Plaintiffs approved and effectuated a Plan of Conversion[4] whereby: (1) Woodside Group, Inc. converted from a Nevada subchapter S-corporation into Woodside Group, LLC, a Nevada limited liability company; (2) more than 100 subchapter-S subsidiaries of Woodside were merged into at least ten

---

[4] Woodside was originally incorporated as a subchapter S corporation. Thus, income generated by Woodside was "passed through" and attributed to its shareholders for tax purposes. As a result, Woodside paid quarterly dividends to its shareholders, including the Plaintiffs, for the primary purpose of allowing shareholders to meet their tax obligations relating to Woodside income. Many shareholders also received dividend payments that exceeded their tax liabilities. Exhibit N at p. 9. From 2006 through 2007, Woodside/Pleasant Hill distributed over $234 million in shareholder dividends (the "2006-2007 Dividends"). *Id.* at p. 16.

new limited liability companies or partnerships; and (3) another thirteen corporations affiliated

with Woodside were converted into limited liability companies (collectively, the "Tax

Conversion").[5]  Plaintiffs did this conversion without following corporate formalities,[6] and

without informing JPMorgan or any member of the Bank Group or obtaining the consent of

JPMorgan or any member of the Bank Group.[7]

       **(7)**      **Involuntary Bankruptcy Filings**

On August 20, 2008, certain noteholders of Woodside (the "Noteholder Group") filed

involuntary bankruptcy petitions against Woodside Group, Pleasant Hill and other Woodside

affiliates also in the United States Bankruptcy Court for the Central District of California,

Riverside Division.  That same day, JPMorgan, on behalf of the Bank Group, joined in the

involuntary bankruptcy petitions.

On September 16, 2008, Pleasant Hill, along with substantially all of the Woodside

Group affiliates, consented to the entry of an order for relief in the involuntary bankruptcy cases.

All of the bankruptcy cases are currently pending in the Bankruptcy Court.

       **(8)**      **Demand Letter**

On September 3, 2009, JPMorgan sent certain Shareholders a demand letter referencing

the Subordination Agreement's terms, obligations and stipulated remedies, and demanding that

the Shareholders comply with the Subordination Agreement by delivering certain wrongfully

obtained funds to JPMorgan, and/or by holding such funds in constructive trust.  *See* Exhibit VV.

---

[5] *Id.* at p. 35.

[6] Exhibit N at p. 6.

[7] Exhibit O at pp. 186:17-190:8.

JPMorgan's demand letter also requested that the Shareholders not transfer or otherwise disseminate certain tax refunds.  *Id.*

      **(9)**     **Court Proceedings**

On September 9, 2009, in response to JPMorgan's Demand Letter, Plaintiffs filed a Complaint against JPMorgan and others for declaratory relief in the Second Judicial District Court for Davis County, Utah, in Civil Case No. 090700622 (the "State Court Proceeding"). That State Court Proceeding was subsequently removed by JPMorgan to this court on September 17, 2009.

On September 23, 2009, JPMorgan filed an Answer, Counterclaims for Relief and Request for Preliminary Injunction in this court.  Therein, JPMorgan asserted that the Shareholders were in breach of the Subordination Agreement and were liable to the Bank Group and to the Administrative Agent, due to the Shareholders' receipt of certain dividends that the Woodside Group/Pleasant Hill issued when an Event of Default existed under the Senior Credit Agreement.  JPMorgan likewise asserted that the Shareholders were also liable for, among other things, conversion, and unjust enrichment, entitling the Bank Group to actual and exemplary damages, attorneys' fees, and various equitable remedies, including the imposition of constructive trusts, specific performance and injunctive relief (collectively, the "Counterclaims").  Subsequently, each member of the Bank Group filed an answer, counterclaims for relief and requests for a preliminary injunction asserting substantially similar Counterclaims as JPMorgan.

In connection with the filing its Answer, JPMorgan filed its Motion for Preliminary Injunction.  All other Defendants subsequently joined in the Motion for Preliminary Injunction.

The briefing on the motion was not expedited and the court allowed the parties to engage in some discovery prior to holding a hearing on the motion.

At the evidentiary hearing on the Motion for Preliminary Injunction, the court admitted and considered numerous exhibits and heard or received testimony from various witnesses both in support of, and in opposition to, the Bank Group's Motion for Preliminary Injunction, including Mr. George W. "Buzz" Welch, Mr. Ezra K. Nilson, Mr. Leonard Arave, Mr. Scott Nelson, Mr. Scott Allen and Mr. F. Wayne Elggren (Plaintiffs' expert).[8]   The Court also considered certain designations of testimony by deposition of several witnesses, including Mr. Chad Gardner, Ms. Mary Darnell and Mr. Paul Aronzon.   Based upon this evidence, and the Court's review and interpretation of the subject loan documents, the Court makes the findings and conclusions referenced herein.

While additional factual findings are necessary to the court's determination of the present motion, the court will make such findings within the context of its analysis of the issues of law presented by the motion.

## II.  CONCLUSIONS OF LAW

The court will first analyze the issues relating to the contractual issues between the parties and then address each of the elements that are requisite to the granting of a preliminary injunction.

---

[8] Prior to the commencement of the Preliminary Injunction Hearing, both Plaintiffs and Defendants designated an expert witness. *See* Dkt. Nos. 58 & 65.  On November 20, 2009, however, prior to the closing of its case-in-chief, JPMorgan withdrew the declaration and report of its expert witness, Mr. Richard A. Clarke.  Accordingly, the court has not considered either the declaration or report of Mr. Clarke, and the court makes no findings or conclusions with respect to Mr. Clarke herein.

*A.*     **Loan Documents**

**1.**     **Subordination Agreement**

Under the Subordination Agreement, the "Borrowing Group," which included Woodside

Group, Pleasant Hill, and various of their affiliates, was permitted to make distributions to the

Subordinated Lenders, and the Subordinated Lenders were permitted to accept such distributions,

only if certain terms and conditions were met.  In particular, the Subordination Agreement

provides:

> Restriction of Payment of Subordinated Debt, Disposition of Payments Received
> by Subordinated Lender.  The members of the Borrowing Group *will not make,*
> *and Subordinated Lender will not accept or receive, any payment or benefit in*
> *cash or otherwise (or exercise any right of, or permit any set-off with respect to,*
> *the Subordinated Debt), directly or indirectly*, on account of any amounts owing
> on the Subordinated Debt, <u>provided, however</u>, the members of the Borrowing
> Group may make, and Subordinated Lender may accept, Permitted Payments
> (hereinafter defined), if and only if at the time of each Permitted Payment and
> both before and after giving effect thereto (a) no Default or Event of Default
> under the Senior Credit Agreement shall have occurred and be continuing . . . .

Exhibit B at § 2 (emphasis added).

Plaintiffs have argued, however, that despite this language, i) the Subordination

Agreement does not apply to dividends because the dividends at issue were not "Subordinated

Debt" paid to the "Subordinated Lender," ii) the payments at issue that were made to Mr. Nilson,

Mr. Arave and Mr. Nilson's children's trusts were by "unrestricted entities" that were not part of

the "Borrowing Group," and iii) these payments were "Permitted Payments" that were not

subject to any relevant restrictions.  The Court finds that each of these assertions lack merit for

the following reasons.

### (a)      "Subordinated Debt" Covers Dividends

First, the Subordination Agreement prohibited members of the Borrowing Group from making any payments, *directly or indirectly*, to the Plaintiffs on account of any "Subordinated Debt" while there existed a Default or Event of Default under the Senior Credit Agreement. *See* Exhibit B at § 2. The definition of Subordinated Debt is clear and unambiguous and includes any and all "indebtedness and other *obligations of every type and nature* owed by members of the Borrowing Group [including Woodside Group and Pleasant Hill] to the Subordinated Lenders [*i.e.*, the Plaintiffs]." *Id.* at § 1(a).

Further, once a dividend is declared, it becomes an obligation of the company to its shareholders. Mr. Arave, Woodside Group's Chief Financial Officer, admitted this in his deposition, and confirmed this fundamental principal at the Preliminary Injunction Hearing. *See* Nov. 19, 2009 Hr'g Tr. at p. 280:6-15. Moreover, Section 2 of the Subordination Agreement also provides that each payment of "Subordinated Debt" reduces "dollar for dollar" any and all dividend payments that have or would become due and owing to Subordinated Lenders (*i.e.*, Plaintiffs).[9]

---

[9] "Permitted Payments" were authorized under the Subordination Agreement if no Event of Default existed under the Senior Credit Agreement. "Permitted Payments" means:

> (i) payments of accrued interest owing on the Subordinated Debt and (ii) payments (including prepayments) of principal, in each case solely out of monies which the members of the Borrowing Group are otherwise entitled to distribute to their respective members, partners or shareholders pursuant to Section 6.6 of the Senior Credit Agreement. *The members of the Borrowing Group agree that each Permitted Payment made to Subordinated Lender shall reduce dollar for dollar the amount available for distribution to members, partners and shareholders of the members of the Borrowing Group pursuant to said Section 6.6.*

Exhibit B at § 2 (emphasis added). Section 6.6 of the Senior Credit Agreement, entitled "Restricted Payments", provides:

> The members of the Borrowing Group will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except (a) each member of the Borrowing Group may declare and pay dividends with

Thus, the Court finds that i) the payments made "on account of Subordinated Debt" contemplated by the Subordination Agreement were integrally intertwined with and were treated the same as dividend payments, ii) dividends were debts and/or obligations of Woodside Group and Pleasant Hill when declared, regardless of whether they were immediately paid to the Shareholders of Woodside, iii) the definition of "Subordinated Debt" in the Subordination Agreement covered dividends, and iv) the Subordination Agreement was intended to and does prohibit dividend distributions when a Default or Event of Default had occurred and was continuing under the Senior Credit Agreement.

> **(b)**    **"Loan Obligation" Repayments to Nilson, Arave and the Trusts**

Plaintiffs next assert that the dividend payments received by Mr. Nilson, Mr. Arave and the Plaintiff Trusts were not covered by Section 2 of the Subordination Agreement because these payments were actually loan repayments by two unrestricted entities, which were referred to as Alameda and Liberty throughout the hearing on the preliminary injunction (and which were identified in Plaintiffs' Exhibit 12).

To assess this argument, an understanding of how the Woodside Group accounted for the dividends declared is required.  Scott Allen (a controller for Woodside Group) testified that

---

respect to its Equity Interests payable solely in additional shares of its common stock, (b) Unrestricted Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, (c) each member of the Borrowing Group may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the members of the Borrowing Group, except as would otherwise cause a Change in Control, and (d) each member of the Borrowing Group may make Restricted Payments to the owners of Equity Interests in such member, so long as both before and after giving effect to each such distribution no Default or Event of Default shall occur and the members of the Borrowing Group shall continue to be in compliance with all of the financial covenants set forth in Section 5.3.

"Restricted Payment", in turn, means "any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in a member of the Borrowing Group, or any payment (whether in cash, securities or other property) ."  *See* Exhibit A at p. 20.

dividends would be declared to provide money for Woodside Group's shareholders to pay their tax obligations flowing from their ownership of Woodside Group, which was a "pass through entity" for tax purposes.  *See* Nov. 19, 2009 Hr'g. Tr. at pp. 236:1-6.  To determine the amount of the dividends, Woodside Group would project its earnings for each quarter or year, and then apply the highest federal and state income tax rates to determine the total amount of dividends needed for each period.  *Id.* at pp. 237:9-238:18.  Pleasant Hill, which served as Woodside Group's "clearinghouse," then would either i) pay the dividends in cash, as in the case of Plaintiff Scott Nelson, or ii) would create "loan obligations" in certain "unrestricted subsidiaries" (*i.e.*, Alameda and Liberty), as in the cases of Plaintiffs Nilson, Arave and the Trusts, in exchange for a reduction in the amount these entities owed Pleasant Hill for management fees. *Id.* at pp. 238:25-241:4.  These loan obligations would then be re-paid to Plaintiffs Nilson, Arave and the Trusts by Pleasant Hill (a member of the Borrowing Group) whenever they needed to pay their taxes.  *Id.*

Plaintiffs argue that since Alameda and Liberty were not part of the "Borrowing Group," these payments are not covered by the Subordination Agreement.  However, Arave admitted in deposition testimony that these "loan obligations" were provided in compensation for the dividends;[10] and Scott Allen admitted that, "at minimum," the repayment of these loan obligations amounted to "indirect benefits" flowing from Pleasant Hill and Woodside Group in compensation for the dividends declared.[11]  *See* Nov. 19, 2009 Hr'g. Tr. at pp. 241:5-243:16.

---

[10] *See* Nov. 19, 2009 Hr'g. Tr. at pp. 279:13-282:9.

[11] *See id.* at pp. 111:7-112:16.

Nilson further confirmed that these payments were benefits that he received in connection with the dividend declarations.

Therefore, the court finds that these "loan repayments" described above were "indirect benefits" received by Plaintiffs "on account of the Subordinated Debt," that included dividends declared by Woodside Group and Pleasant Hill, and, as such, were prohibited while an Event of Default existed under the Senior Credit Agreement, as discussed below.  Thus, the Court concludes that the various inter-company transfers made within the Woodside entities did not change the nature or character of the dividends originally declared.  As such, payments made to or for the benefit of the Shareholders, directly or indirectly, were subject to the Subordination Agreement.

<b>(c)      Permitted Payments under Subordination Agreement</b>

Plaintiffs next argue that the dividends and "loan repayments" at issue were "Permitted Payments" under the Subordination Agreement.  However, even if the "loan repayments" or dividends at issue were "Permitted Payments," these transfers could not be made if there was an Event of Default that had occurred and was continuing under the Senior Credit Agreement.  As stated above, the Subordination Agreement states that "the members of the Borrowing Group may make, and Subordinated Lender may accept, Permitted Payments . . . if and only if at the time of each Permitted Payment and both before and after giving effect thereto (a) no Default or Event of Default under the Senior Credit Agreement shall have occurred and be continuing." Exhibit B at § 2.

Thus, the court finds that since the dividends and loan repayments at issue were, at minimum, indirect benefits received by Plaintiffs from the Borrowing Group, any such Permitted

Payments made while there was an Event of Default under the Senior Credit Agreement was prohibited.  The Court next turns to the issue of whether and when any Event of Default occurred under the Senior Credit Agreement.

> **2.      Senior Credit Agreement**

> **(a)      Events of Default under the Senior Credit Agreement**

The court has found that multiple Events of Default occurred under the Senior Credit Agreement, beginning with the submission of the November 2006 Borrowing Base Certificate, and continuing through September 2007.

> **(i)      Senior Unsecured Debt Exceeded the Borrowing Base in Violation of Article 6 of the Senior Credit Agreement**

JPMorgan and the Bank Group point to various provisions of the Senior Credit Agreement in assessing whether and when an Event of Default occurred.  First, Section 6.1(a)(i) of the Senior Credit Agreement, a negative covenant agreed to by the Borrowing Group, expressly provides that "at no time shall the Senior Unsecured Debt exceed the Borrowing Base."  Mr. Nilson admitted at the Preliminary Injunction Hearing that it was Woodside Group's (and only Woodside Group's) duty and obligation to ensure that it remained in compliance with this covenant.  *See* Nov. 18, 2009 Hr'g. Tr. at pp. 82:10-83:24.

In order to comply with Section 6.1(a), JPMorgan and the Bank Group assert, and Mr. Nilson has conceded,[12] that Woodside Group and Pleasant Hill were required to calculate the Borrowing Base pursuant to Section 2.20 of the Senior Credit Agreement, entitled "Determination of Borrowing Base," and all subsections thereto, including Section 2.20.9(a), which states that "[a]t no time shall the sum of the Borrowing Base value attributable to Entitled

---

[12] *See* Nov. 18, 2009 Hr'g Tr. at pp. 67:17-68:3, p. 85:1-23, p. 89:2-6 and p. 91:2-24.

Land, Lots Under Development, and Finished Lots exceed sixty percent (60%) of the entire

Borrowing Base at the time of determination." Exhibit A at p. 49. This limitation is referred to

as the "60% Limitation."

It is undisputed that, at all times prior to October 2007, the Borrowing Group (including

Pleasant Hill and Woodside Group) did not apply the 60% Limitation when performing their

Borrowing Base calculations.[13]  After JPMorgan discovered this failure (*i.e.*, in October 2007

when it analyzed the August 2007 Borrowing Base Certificate), JPMorgan prepared Defendants'

Exhibit T, which is a spreadsheet analyzing i) when and by how much the Borrower borrowed

more than was allowed under the Senior Credit Agreement, and ii) the extent to which the "Total

Allowable Borrowing" was misrepresented by the Borrower. *See* Exhibit KKKKK at ¶¶ 33-35;

*see also* Exhibit T.

Based on Defendants' Exhibit T and Mr. Welch's testimony, the Court finds that the

Borrowing Group, in contravention of Section 6.1(a) of the Senior Credit Agreement, caused the

total Senior Unsecured Debt to exceed the maximum allowable Borrowing Base value. In fact,

as of January 31, 2007, the Borrower was approximately $78 million overdrawn under the Total

Allowable Borrowing. *See* Exhibit T. The Court finds that this violation by the Borrower of the

negative covenant contained in Section 6.1(a) of the Senior Credit Agreement continued through

September 2007, thus resulting in additional Events of Default under Section 7.1.4 of the Senior

Credit Agreement.[14]

---

[13] *See generally* Nov. 18, 2009 Hr'g Tr. at pp. 96:25-98:5 (Ezra Nilson testimony); *see also* Nov. 19, 2009 Hr'g. Tr. at pp. 250:5-251:1 (Scott Allen testimony); Nov. 19, 2009 Hr'g Tr. at pp. 287:20-288:24 (Len Arave testimony).

[14] Section 7.1.4 of the Senior Credit Agreement provides that an Event of Default shall occur if "[a] member of the Borrowing Group shall fail to observe or perform any covenant, condition or agreement contained in . . . ARTICLE 6." Exhibit A at p. 68.

As further support for the methodology used in Defendants' Exhibit T, JPMorgan and the Bank Group refer to Mr. Arave's own calculation of the maximum allowable Borrowing Base that he prepared in his deposition.  *See* Exhibit U.  This calculation evidenced Mr. Arave's effort to determine whether the Borrowing Base Certificate for January 31, 2007 was overstated.  As Arave acknowledged, using the Borrowing Group's own data in its January 31, 2007 Borrowing Base Certificate, the Borrowing Base (or "Total Allowable Borrowing") was overstated by more than $115 million.  *See* Nov. 19, 2009 Hr'g. Tr. at p. 297:17-21.  Mr. Welch testified, and Plaintiffs do not dispute, that if this same methodology that Arave labeled as "reasonable" is applied to the other relevant months, the conclusion is the same as evidenced by Exhibit T—that is, the Borrowing Group's Senior Unsecured Debt exceeded its Borrowing Base in January 2007, and it continued through September 2007.

### (ii)  Borrowing Group Made Material Misrepresentations Resulting in Additional Events Of Default.

The Court finds that multiple Events of Default occurred due to over a dozen material misrepresentations by the Borrower that likely began in November 2006 and continued through September 2007.  Section 5.1.6 of the Senior Credit Agreement required the Borrower to furnish, or cause to be furnished, to the Agent and each Lender:  "[a]s soon as available, . . .  a Borrowing Base Certificate reflecting the Borrowing Base as of the end of such month. "  These Borrowing Base Certificates required the Borrower to certify: (a) all information contained in the Borrowing Base and Inventory Report was true and correct and calculated in accordance with the definitions as required in the Senior Credit Agreement; (b) the Borrower was in compliance with all covenants set forth in the Senior Credit Agreement; (c) no Event of Default existed under the Senior Credit Agreement; and (d) all representations and warranties were true and correct in all

material respects.[15]  Mr. Nilson conceded that, to accurately state the Borrowing Base and to comply with the Borrowing Group's obligation to submit accurate Borrowing Base Certificates, the 60% Limitation would need to be applied in connection with submission of these certificates. *See* Nov. 18, 2009 Hr'g Tr. at pp. 67:17-68:3 and p. 85:1-23.

While the Woodside Group and Pleasant Hill submitted Borrowing Base Certificates to JPMorgan each month subsequent to the signing of the Senior Credit Agreement, it is undisputed that they never applied the 60% Limitation.[16]  As a result, the evidence establishes and the court finds that, in November of 2006, and continuing through September of 2007, each of the Borrowing Base Certificates submitted by the Borrower to JPMorgan misrepresented the Borrowing Base by failing to include the 60% Limitation, thus significantly overstating the "Total Allowable Borrowing."  In particular, the court finds and concludes that an Event of Default occurred in November 2006 when Mr. Arave, as CFO and Manager of Pleasant Hill, signed the November 30, 2006 Borrowing Base Certificate and certified to JPMorgan that the amount of the "Total Allowable Borrowing" was "true and correct" and had been "calculated in accordance with the definitions as required in the [Senior Credit] Agreement."

While the Borrower, through Mr. Arave, represented that the Total Allowable Borrowing was $424,253,262 in the November Borrowing Base Certificate, had the Borrower properly taken into account the 60% Limitation as required under the Senior Credit Agreement, the Total

[15] It was undisputed at the Preliminary Injunction Hearing that an Event of Default would occur if the Borrowing Base Certificates contained material misrepresentations.  Moreover, as provided in Sections 2.3.1 and 5.1.5 of the Senior Credit Agreement, certain Borrowing Requests and Certificates of Compliance were also required to be provided by the Borrower to JPMorgan.  Within these documents, the Borrower made similar certifications and representations, each of which ultimately proved to be incorrect, thus constituting separate Events of Default.

[16] Mr. Arave and Mr. Gardner have acknowledged that it was an "oversight" by the Company not to include the 60% Limitation in calculating the Borrowing Base.  Mr. Nilson likewise acknowledged the Borrower's "mistake."  *See* Nov. 18, 2009 Hr'g Tr. at pp. 96:11-98:5.

Allowable Borrowing would have been reduced by approximately $15 million, an amount that Woodside Group's own controller agrees is material to the Woodside Group.  Nov. 19, 2009 Hr'g Tr. at p. 256:3-12.  Likewise, Mr. Welch explained that this misrepresentation was material not only because of the amount of money at issue, but because of i) the systemic nature of the problem—*i.e.*, the Borrower's failure to take into account the 60% Limitation in any respect; and ii) the need for JPMorgan, as Administrative Agent, to notify and discuss this type of Default with the other members of the Bank Group.  *See* Exhibit KKKKK at ¶¶ 16, 26 and 52; *see also* Nov. 20, 2007 Hr'g Tr. at pp. 529:4-22.

These misrepresentations continued in each subsequent Borrowing Base Certificate through at least September of 2007.  *See* Exhibits R and T.  Each of these misrepresentations was material, and that Plaintiffs' own testimony supports this conclusion.  Specifically, according to Mr. Arave's own calculation, evidenced by Exhibit U and discussed above, the Woodside Group overstated the Borrowing Base by over $115 million, which Mr. Nilson acknowledged is a material misrepresentation of the Borrowing Base.  *See* Nov. 18, 2009 Hr'g. Tr. at pp. 168:8-171:10.  Accordingly, the court finds that the misrepresentations by the Borrower of the Total Allowable Borrowing (*i.e.*, Available Commitment) constituted an Event of Default under Section 7.1.3 of the Senior Credit Agreement.  These misrepresentations continued through September 2007.

There were additional material misrepresentations made by the Borrower in their Borrowing Requests and Certificates of Compliance.  As provided in Sections 2.3.1 and 5.1.5 of the Senior Credit Agreement, Borrowing Requests and Certificates of Compliance were also required to be provided by the Borrower to JPMorgan, and were submitted to JPMorgan from

November 2006 through September 2007.  *See* Hearing Exhibits Z and AA.  Within these documents, the Borrower certified and represented that there were no Events of Default under the Senior Credit Agreement.  The Court finds that each of these representations, as discussed above, ultimately proved to be false from November 2006 through September 2007.

Section 7.1.3 of the Senior Credit Agreement provides that any material misrepresentation in certificates or reports submitted by the Borrowing Group constitutes an Event of Default.[17]  As a result, the Court finds that, pursuant to Section 7.1.3, Events of Default occurred each time the Borrower submitted the Borrowing Base Certificates, Borrowing Requests and Certificates of Compliance from November 2006 through September 2007.  *See* Exhibits R, Z and AA; *see also* Exhibit YYYY (summarizing the various misrepresentations that were contained in the various Borrowing Base Certificates, Borrowing Requests, and Certificates of Compliance).

### (iii)    Additional Events of Default Under Senior Credit Agreement

The Borrowing Group also failed to disclose to JPMorgan the above Events of Default, as required by Section 5.2.1 of the Senior Credit Agreement, thus triggering other Events of Default.  Exhibit A at p. 57.  Likewise, an Event of Default was triggered each time the Borrowing Group failed to notify JPMorgan that they were not performing the 60% Limitation calculation.  Performing this calculation would be required to prevent a "Materially Adverse Event" as defined in the Senior Credit Agreement.  *See* Exhibit A at § 5.2.4.

---

[17] Section 7.1.3 of the Senior Credit Agreement provides that an "Event of Default" under the Agreement shall occur if "[a]ny representation or warranty made or deemed made by or on behalf of a member of the Borrowing Group or any Restricted Subsidiary in or in connection with this Agreement . . . or in any . . . certificate . . . furnished pursuant to or in connection with this Agreement . . . shall prove to have been materially incorrect when made or deemed made."  Exhibit A at p. 68.

In sum, the Court finds that the overwhelming evidence establishes that the Borrowing Group was in Default under the Senior Credit Agreement from November 2006 through September 2007.  *See* Exhibit ZZZZ (summarizing the various Events of Default that occurred under the Senior Credit Agreement).

<b>(iv)     Section 2.20.1 of the Senior Credit Agreement</b>

Plaintiffs suggest that Section 2.20.1 of the Senior Credit Agreement places the responsibility for "determining the Borrowing Base" on JPMorgan, as Administrative Agent, and contend that the failure to perform the 60% Limitation, therefore, falls on JPMorgan.  The court, however, finds that this provision does not place the obligation of establishing the Borrowing Base on JPMorgan.

For the following reasons, the Court finds that it was the obligation of the Borrowing Group to calculate, establish, and determine the Borrowing Base:

- As discussed in detail above, and as conceded by Plaintiffs, Section 5.1.6 of the Senior Credit Agreement required the Borrowing Group to perform a detailed calculation of the Borrowing Base, per Section 2.20, which would include the obligation to take into account the 60% Limitation.

- Section 2.20.10 of the Senior Credit Agreement clearly and unequivocally states that the Borrowing Base is "established and determined" based upon the Borrowing Base Certificates.  Exhibit A at p. 49.  Thus, it is unambiguous that the parties intended for the Borrower to prepare and submit Borrowing Base Certificates that would establish what the Borrowing Base would be for each applicable Borrowing Base Valuation Date (*i.e.*, the end of each month).  This is supported by Plaintiffs' concession that they were the only ones with the necessary information and data to make this calculation.  Nov. 18, 2009 Hr'g Tr. at pp. 86-93.

- Sections 8.3 and 8.4 of the Senior Credit Agreement likewise confirm this construction.  Section 8.3 states that "the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into . . . (ii) the contents of any certificate [*i.e.*, a Borrowing Base Certificate] . . . delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants,

22

agreements or other terms or conditions set forth herein, . . . other than to confirm receipt of items expressly required to be delivered to the Administrative Agent." Likewise, Section 8.4 of the Senior Credit Agreement provides that the Agent "shall be entitled to rely upon, and shall not incur any liability for relying upon, any . . . certificate [*i.e.*, a Borrowing Base Certificate] . . . believed by it, in good faith, to be genuine and to have been signed or sent by the proper Person."[18]  If JPMorgan were required to "determine the Borrowing Base," it would render these provisions meaningless.

- Lastly, Plaintiffs acknowledge that it was the Borrowing Group's obligation to calculate the Borrowing Base and that Woodside was the only entity that had access to the necessary information to be used to compute the Borrowing Base. *See* Nov. 18, 2009 Hr'g. Tr. at pp. 86-93.

Regardless of which party was obligated to determine or establish the Borrowing Base, there is no dispute that the Borrowing Group was required to comply with its covenant contained in Section 6.1(a) of the Senior Credit Agreement, and comply with the requirement to submit accurate Borrowing Base Certificates setting forth the Borrowing Base, as calculated pursuant to Section 2.20, including the 60% Limitation.  Mr. Nilson acknowledged these obligations.  *See* Nov. 18, 2009 Hr'g. Tr. at pp. 82:10-91:24.  Thus, regardless of which party was responsible for setting the Borrowing Base value, this fact does not excuse the Events of Default caused by the Borrowing Group.

For these reasons, it was the Borrower's obligation to determine the Borrowing Base pursuant to Section 2.20 of the Senior Credit Agreement, and even if this responsibility was JPMorgan's, this fact would not remedy or excuse the above Events of Default.

**B.     Plaintiffs' Receipt of Payments**

Because the Subordination Agreement provided that no dividends or "loan repayments" were allowed when an Event of Default occurred and was continuing under the Senior Credit

---

[18] Thus, Plaintiffs' argument that "[t]he Bank had at all relevant times all of the information necessary to assess the Company's compliance with this borrowing base limitation" is irrelevant.  Opposition at p. 17.

Agreement, the court next considers the amount of the payments that were received in violation of the Subordination Agreement.

At the Preliminary Injunction Hearing, Mr. Allen confirmed that Exhibit FF, a Woodside Group document created by him as corporate representative, demonstrated that the following prohibited payments were made by Woodside Group and received by Plaintiffs in 2007:

| Plaintiff | 1st Jan. '07 | 2nd Jan. '07 | Apr. '07 | June '07 | Sept. '07 | 2007 YTD |
|---|---|---|---|---|---|---|
| Leonard Arave | $124,933 | $87,075 | $165,063 | $132,505 | $113,576 | $623,151 |
| Jessica Nilson Trust | $637,275 | $444,162 | $837,970 | $676,527 | $579,881 | $3,175,816 |
| Nellie Joe Nilson Trust | $558,769 | $389,445 | $734,246 | $593,262 | $508,511 | $2,794,233 |
| Brett Nilson Trust | $618,339 | $430,964 | $812,950 | $656,443 | $562,665 | $3,081,361 |
| Abby Nilson Trust | $646,477 | $450,575 | $850,126 | $686,285 | $588,245 | $3,221,707 |
| Joy Nilson Trust | $627,110 | $437,083 | $824,550 | $665,754 | $570,647 | $3,125,152 |
| Benjamin Ezra Nilson Trust | $630,894 | $439,714 | $831,674 | $669,130 | $573,540 | $3,144,952 |
| Ezra K. Nilson | $7,512,734 | $5,236,146 | $9,936,868 | $7,966,480 | $6,828,411 | $37,480,640 |
| Scott Nelson | $714,310 | $497,852 | $943,755 | $757,601.25 | $649,372.50 | $3,562,890.45 |
| **TOTAL** | | | | | | **$60,209.902.45** |

Exhibit FF at p. 6.

Section 3 of the Subordination Agreement required Plaintiffs to hold such funds in trust and to immediately deliver such funds to JPMorgan, as Administrative Agent.  Specifically, the Subordination Agreement provides:

> **Delivery of Payments**.  In the event that notwithstanding this Agreement, any payment or distribution of assets of the members of the [Woodside] Group or any of their Subsidiaries of any kind or character, whether in cash, property, or securities, from any source whatsoever shall be received by Subordinated Lender contrary to the provisions of this Agreement, *such payment or distribution shall be held in trust for the benefit of and shall be immediately paid or delivered (with*

*all necessary endorsements) by such holder to the Administrative Agent*, for
application to the payment or prepayment of all such Specified Senior Debt
remaining unpaid, to the extent necessary to pay all such Specified Senior Debt in
full in cash after giving effect to any other concurrent payment or distribution to
the Senior Lenders.

*See* Exhibit B at § 3 (emphasis added).

Plaintiffs concede that they never held the above monies in trust or delivered them to
JPMorgan notwithstanding the Event of Default under the Senior Credit Agreement.  Rather,
Plaintiffs spent these funds to pay taxes that were owed.  Thus, Plaintiffs breached the
Subordination Agreement by failing to abide by its explicit terms.

**C.     Likelihood of Prevailing on Counterclaims**

Based upon the testimony elicited at the Preliminary Injunction Hearing, and after
considering all of the evidence, the Court finds and concludes that there is a substantial
likelihood that JPMorgan and the Bank Group will prevail on the merits of the Counterclaims
they have asserted against Plaintiffs.  These Counterclaims are briefly discussed below.

**(1)     The Bank Group's Counterclaims**

**(a)     Breach of the Subordination Agreement**

Under Utah law, a breach of contract occurs when: (i) a contract exists; (ii) the party
seeking recovery has fully performed under the contract; (iii) there is a breach of the contract by
the other party; and (iv) the party seeking recovery suffers damages.  *Moss v. Parr Waddoups
Brown Gee & Loveless*, 197 P.3d 659 (Utah Ct. App. 2008).

Based on the relevant facts, the Court finds and concludes that the Defendants are likely
to prevail on their claim for breach of the Subordination Agreement because: (i) the
Subordination Agreement is a valid, binding and enforceable contract; (ii) there is no evidence

that Defendants have not fully performed their obligations under the contracts at issue; (iii) the

Plaintiffs likely breached the Subordination Agreement by accepting and retaining distributions

wrongfully made, directly or indirectly, by the Woodside Group and/or Pleasant Hill while those

entities were in default under the Senior Credit Agreement, and by failing to either hold the

wrongly received payments in trust or immediately paying the funds to JPMorgan as required by

the Subordination Agreement; and (iv) the Defendants sustained actual damages flowing from

the breach because the funds that were improperly paid to the Plaintiffs should have been applied

to the outstanding debt obligations owed by the Borrower to Defendants under the Senior Credit

Agreement.

(b)    <strong>Specific Performance</strong>

The Utah Supreme Court has held that specific performance is an equitable remedy

addressed to the sense of justice and good conscience of the court.  *Morris v. Sykes*, 624 P.2d

681, 684 (Utah 1981).  Moreover, the trial court enjoys "considerable latitude of discretion" in

determining whether specific performance shall be granted.  *Id.*  In determining whether to grant

specific performance, the court examines the contract at issue and the circumstances pertaining

to its execution and formation to determine whether equitable grounds exist to grant or deny

specific performance.  *Otteson v. Malone*, 584 P.2d 878, 879-80 (Utah 1978).

In this case, Section 14 of the Subordination Agreement, which was negotiated by two

sophisticated parties in an arm's length transaction, provides for the availability of certain

remedies in the event of a breach and states:

> In addition, Administrative Agent and Senior Lenders shall be entitled to
> equitable relief, including without limitation specific performance, in order to
> enforce this Agreement and Subordinated Lender[s] waive[s] any claims that

26

Administrative Agent and Senior Lenders are not entitled to such relief, including, without limitation, that there is an adequate legal remedy.

Exhibit B at § 14.

Based on the above facts, the Court concludes that the Defendants are likely to prevail on their claim for specific performance.  When the Plaintiffs wrongfully accepted the distributions at issue, they breached both the Subordination Agreement and their express trust obligation to JPMorgan.  The Subordination Agreement expressly provides that the Defendants are entitled to the equitable remedy of specific performance in order to obtain a judgment requiring Plaintiffs to specifically perform their obligations of returning to Defendants all funds they received in breach of the Subordination Agreement.  Moreover, Plaintiffs agreed to waive making any argument that Defendants had an adequate remedy at law.

(c)   <strong>Unjust Enrichment</strong>

Under Utah law, unjust enrichment occurs when: (i) a benefit is conferred on one person by another; (ii) the conferee appreciates and/or has knowledge of the benefit; and (iii) the conferee accepts or retains the benefit under circumstances that make it inequitable for the conferee to retain the benefit without payment of its value.  *Kimball v. Kimball*, 217 P.3d 733, 747 (Utah Ct. App. 2009).

Based on the above facts, the Court finds and concludes that the Defendants are likely to prevail on their unjust enrichment claim because: (i) the Plaintiffs received and/or accepted wrongful distributions from the Woodside Group and/or Pleasant Hill, and the acceptance thereof conferred improper benefits upon them; (ii) the Plaintiffs knew, or should have known, of their receipt of those benefits; and (iii) permitting Plaintiffs to retain the benefits conferred upon them would be inequitable, given their indebtedness to Defendants.

### (d)     Constructive Trust

The imposition of a constructive trust is proper under Utah law when: (i) there is a wrongful act; (ii) the party against whom constructive trust is sought has been unjustly enriched; and (iii) specific property can be traced to the wrongful behavior. *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 361-62 (Utah 2007).  A wrongful act is established by facts evidencing that an entity obviously must have received funds by mistake or participated in active or egregious conduct. *Id.*  Moreover, the Utah Supreme Court has stated that constructive trusts are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another. *Id.* at 362.

Based on the above facts, Defendants are likely to prevail on their claim for constructive trust because: (i) the Plaintiffs acted wrongfully in accepting and retaining the improper distributions from Woodside Group and/or Pleasant Hill; (ii) the Plaintiffs have been, and continue to be, unjustly enriched as a result of their wrongful conduct;[19] and (iii) the specific funds received by the Plaintiffs can be directly traced to the wrongful behavior of the Plaintiffs themselves.  Further, the Subordination Agreement specifically required Plaintiffs to hold such monies in trust, and Plaintiffs failed to do so.

---

[19] The Court finds that Plaintiffs received the dividend payments they used to pay taxes and resultant tax refunds of the dividend payments either by mistake or active misconduct.  Mr. Nilson testified that Woodside Group failed to conduct the 60% Limitation calculation (which resulted in the numerous acts of default discussed above) because Mr. Arave simply forgot to include the 60% Limitation calculation in the Borrowing Base Certificates. *See* Nov. 18, 2009 Hr'g. Tr. at pp. 193-194:14.  Woodside Group, however, on June 1, 2006, knew that the 60% Limitation was required under the Senior Credit Agreement.   *See* Nov. 19, 2009 Hr'g. Tr. at pp. 261:13- 264:15; 266:7-267:5; 312:9-315:17; Exhibit X.   The evidence also indicates that Woodside Group discovered in June or July 2007 that it had not been using the 60% Limitation on its Borrowing Base Certificates. *See* Nov. 19, 2009 Hr'g. Tr. at pp. 323:2-328:18; Exhibit GGGGG (Gardner Deposition Excerpts) at pp. 244:23-246:1; 250:20-252:24; Exhibit RRRR. After this discovery in the summer of 2007, Woodside Group failed to conduct the 60% Limitation calculation, failed to notify the Bank Group of an event of default, and declared and paid themselves dividends.  Accordingly, Woodside Group either mistakenly or intentionally declared and paid dividends despite an Event of Default so they could pay the taxes that resulted in their receiving the tax refunds which are at issue here.

(e)     **Conversion**

In Utah, a cause of action for conversion exists when: (i) there is willful interference with personal property; (ii) without lawful justification; (iii) by which the person entitled to the property is deprived of its use or possession; and (iv) the party alleging conversion was entitled to immediate possession of the property at the time of conversion.  *Bennett v. Huish*, 155 P.3d 917, 928 (Utah App. 2007); *Jones v. Salt Lake City Corp.*, 78 P.3d 988, 992 (Utah App. 2003). Importantly, courts have found that while intentional conduct is required, conscious wrongdoing is not.  As a result, the intent to exercise dominion is enough to satisfy a conversion claim.  *Id.*

Based on the above facts, the Court finds and concludes that the Defendants are likely to prevail on their claim for Conversion because: (i) the Plaintiffs directed the payment of the distributions – which are personal property rightfully belonging to Defendants – from Woodside Group and/or Pleasant Hill to, or for the benefit of, themselves at a time when they knew or should have known that some or all of the payments were made wrongfully; (ii) the transfers were made knowingly and wrongfully, without lawful justification; (iii) the knowing exercise and dominion and control over the funds in denial of and in derogation of Defendants' title to or rights therein; and (iv) the Defendants were entitled to the immediate use and possession of the funds at the time of the conversion.

(2)     **Plaintiff's Defenses to Counterclaims**

(a)     **Waiver/Estoppel**

The Utah Supreme Court has consistently defined waiver as the intentional relinquishment of a known right.  *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939-40 (Utah 1993); *Am. Sav. & Loan Ass'n v. Blomquist*, 445 P.2d 1, 3 (Utah 1968).  Moreover,

mere silence is not a waiver unless there is some duty or obligation to speak.  *Soter's*, 857 P.2d at

940.  In general, "a duty to speak will not be found where the contracting parties 'deal at arm's

length, and where the underlying facts are reasonably within the knowledge of both parties.

Under such circumstances, the plaintiff is obliged to take reasonable steps to inform himself, and

to protect his own interests.'"  *Geisdorf v. Doughty*, 972 P.2d 67, 72-73 (Utah 1998) (citations

omitted).

Plaintiffs assert that JPMorgan and the Bank Group waived the 60% Limitation contained

in the Senior Credit Agreement by i) failing to inform and/or delaying informing the Borrower of

the Events of Default, ii) implicitly agreeing to relieve the Borrower from its obligation to

comply with the 60% Limitation,[20] and/or iii) by allowing or authorizing the Borrower to declare

certain "tax dividends" in connection with the Second Forbearance Agreement.  However, the

Court finds that the following evidence contradicts these assertions:

- Section 9.2.1 of the Senior Credit Agreement provides:  "*No failure or delay by the Administrative Agent*, the Issuing Bank or any Lender *in exercising any right or power hereunder shall operate as a waiver thereof*, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted Section 9.2.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. *Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time*."  (Emphasis added.)

---

[20] *See* Nov. 18, 2009 Hr'g Tr. at pp. 98:12-99:23.

- Section 9.2.2 of the Senior Credit Agreement further provides that "[n]either this Agreement nor any provision hereof can be waived . . . except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or the Borrower and the Administrative Agent with the consent of the Required Lenders, *provided that no such agreement shall (a) increase the Commitment of any Lender without the written consent of such Lender*." (Emphasis added.)

-  Section 6 of the Subordination Agreement provides:  "*[T]he Administrative Agent and Senior Lenders may*, at any time and from time to time, without notice to or the consent of Subordinated Lender and without incurring responsibility to Subordinated Lender or impairing or releasing any of the Senior Lenders' or Administrative Agent's rights or any of Subordinated Lender's obligations hereunder: . . . (d) exercise or *refrain from exercising any right against the Borrowing Group or any other Person (including Subordinated Lender)*." (Emphasis added.)

- Section 18 of the Subordination Agreement further provides:  "*No waiver shall be deemed to be made by Administrative Agent or the Senior Lenders of any of their rights hereunder*, nor shall any consent or approval hereunder be effective, unless the same shall be in writing signed by the Administrative Agent on behalf of the Senior Lenders, and each such waiver, consent or approval, if any, shall be effective with respect to the specific matter or matters to which the waiver, consent or approval relates *and shall in no way impair the rights of the Administrative Agent or Senior Lenders or the obligations of Subordinated Lender to the Administrative Agent and Senior Lenders in any other respect at any time*."  (Emphasis Added.)

- Plaintiffs acknowledge in both Forbearance Agreements that there were "Existing Events of Default" that emanated from violations of Sections 6.1(a) and 2.20.9(a) of the Senior Credit Agreement, and both of these agreements contain specific non-waiver provisions that state that the Bank Group is not waiving any such "Existing Defaults."  *See* Exhibit D at ¶¶ C, 3, 9(b); *see also* Exhibit E at ¶¶ C, 7, 15(b).

- Plaintiffs acknowledge that the Borrowing Base Certificates do not notify, disclose, or communicate to the Bank Group that Woodside had not conducted the 60% Limitation calculation as part of its represented Borrowing Base Certificate. *See* Nov. 18, 2009 Hr'g. Tr. at pp. 195:4-16; Exhibit S.

- Plaintiffs acknowledge that Woodside represented in the Borrowing Base Certificates that the Borrowing Base Certificates contained a calculation that complied with the definition of the Borrowing Base, which included the 60%

Limitation.  Plaintiffs further acknowledge that Woodside Group understood the
Bank Group would rely on this representation.  *See* Nov. 18, 2009 Hr'g. Tr. at pp.
196:2-199:20; Exhibit S.

- Plaintiffs acknowledge that neither JPMorgan nor any member of the Bank Group
  ever communicated to Woodside Group that it did not need to perform the 60%
  Limitation calculation.  *See* Nov. 18, 2009 Hr'g. Tr. at pp. 203:13-16.

- Plaintiffs failed to present any evidence that any other members of the Bank
  Group knew or discovered prior to October 2007 that Woodside Group had failed
  to include the 60% Limitation calculation in its Borrowing Base Certificates.

Additionally, Plaintiffs' assertion that JPMorgan or any of the other members of the Bank

Group waived their rights because they knew or should have known of the Events of Default is

not supported by the Senior Credit Agreement and the facts.  Section 8.3 of the Senior Credit

Agreement, which is the only provision in the agreement that describes the Agent's duties,

specifically provides that:

> The Administrative Agent shall be deemed not to have knowledge of any Default
> unless and until written notice thereof is given to the Administrative Agent by the
> Borrower or a Lender, and the Administrative Agent shall not be responsible for
> or have any duty to ascertain or inquire into . . . (ii) the contents of any certificate
> [*i.e.*, a Borrowing Base Certificate] . . . delivered hereunder or in connection
> herewith, (iii) the performance or observance of any of the covenants, agreements
> or other terms or conditions set forth herein, . . . other than to confirm receipt of
> items expressly required to be delivered to the Administrative Agent.

Section 8.4 of the Senior Credit Agreement further provides that the Administrative Agent:

> [S]hall be entitled to rely upon, and shall not incur any liability for relying upon,
> any . . . certificate [*i.e.*, a Borrowing Base Certificate] . . . believed by it, in good
> faith, to be genuine and to have been signed or sent by the proper Person."[21]

---

[21] Thus, as mentioned above, Plaintiffs' argument that "[t]he Bank had at all relevant times all of the information
necessary to assess the Company's compliance with this borrowing base limitation" is irrelevant.  Opposition at p.
17.

The Court concludes that neither JPMorgan nor any member of the Bank Group intentionally relinquished or waived the 60% Limitation or any other provision of the operative agreements.

Under these circumstances, and consistent with Mr. Welch's testimony,[22] the court finds and concludes that JPMorgan and the other members of the Bank Group never had actual knowledge of an Event of Default until October 2007 (and thus never intended to waive such default); JPMorgan was neither required nor obligated under the Senior Credit Agreement to independently investigate whether or not any potential defaults may have occurred; JPMorgan and the other members of the Bank Group were entitled, under the Senior Credit Agreement, to rely on the representations made in the Borrowing Base Certificates; neither JPMorgan nor any member of the Bank Group ever provided the Borrower with any written notice of a waiver;[23] and both the Senior Credit Agreement and Subordination Agreement contain non-waiver provisions, which the court finds enforceable.

Accordingly, the court concludes that Plaintiffs have failed to set forth any evidence suggesting that Defendants intentionally relinquished any of their rights to either declare a default, to enforce their remedies, or to enforce any provision of the agreements at issue.  For similar reasons, the Court finds and concludes that Plaintiffs' estoppel arguments are without support based on the evidence presented.[24]

---

[22] *See* Exhibit KKKK at ¶ 32; *see also* Nov. 19, 2009 Hr'g Tr. at p. 388:14-15.

[23] *See* Nov. 18, 2009 Hr'g Tr. at pp. 98:12-99:23.

[24] The Court notes that the independent bankruptcy examiner, Mr. Aronzon, likewise testified, via his deposition, that it was his opinion that "claims turn on the conduct of the shareholders and management, not on the conduct of the bank."  Exhibit O at p. 53:6-8.

(b)      **Exhibit E to the Senior Credit Agreement**

Plaintiffs have further argued that "the Company was filling out and submitting to the Bank all of the Bank's forms designed to monitor covenant compliance."  Opposition at p. 17. While Exhibit E provides a template for completing a Borrowing Base Certificate, it does not contemplate all of the variables that may exist that can affect the amount of the Borrowing Base, and certainly was not intended to comprehensively identify all of the limitations that may apply to Borrowing Base calculations.  As such, this form was never intended to replace the explicit terms and requirements of the Senior Credit Agreement, including the 60% Limitation.

Moreover, Exhibit E to the Senior Credit Agreement (Defendants' Exhibit P) was intended to be "substantially similar" to the type of format that would be used by a Borrower to certify that it had calculated the Borrowing Base in accordance with the requirements and limitations of the Senior Credit Agreement.  This exemplar was not intended to override the substantive terms set out in the body of the Senior Credit Agreement.  That none of the Borrowing Base limitations found in Sections 2.20.3 through 2.20.9 had separate line-items in Exhibit E confirms this court's conclusion, as does the undisputed fact that the Borrower was still required to consider, and actually did consider, most of the limitations that comprised the Borrowing Base calculation.

The court concludes, therefore, that the absence of a specific line item with respect to the 60% Limitation on Exhibit E did not modify the express terms of the Senior Credit Agreement, including Section 2.20.9(a) therein.

*D.*      **Irreparable Harm**

Irreparable injury occurs "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).  Moreover, "an injury is not speculative simply because it is not certain to occur.  An 'irreparable harm requirement is met if a [movant] demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (emphasis in original) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)).

First, Plaintiffs argue that Defendants cannot meet this element for a preliminary injunction because of delay.  "Any unnecessary delay in seeking relief" cuts against a claim that "there is an urgent need for immediate relief and that a judgment would be rendered ineffective unless some restraint is imposed on [the non-moving party] pending an adjudication on the merits."  *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1202, 1221 (D. Utah 2004).  The court finds that JPMorgan did not delay in bringing a motion for preliminary injunctive relief in this case.  The relevant time frame for considering delay is when the tax refunds were paid.  Prior to receipt of the Tax Refunds, the court would not have been able to fashion injunctive relief.  Moreover, any alleged delay in seeking injunctive relief has not caused or altered the outcome, has not caused any additional harm, and has not prejudiced Plaintiffs.  Although more fully discussed below, the court concludes that any delay that may have occurred does not militate against a finding of irreparable harm.

In addition, under this element for injunctive relief, the court usually analyzes whether the moving party has an adequate remedy at law.  But in this case, under the Subordination Agreement, Plaintiffs agreed not to assert in any action for specific performance of the agreement that Defendants have an adequate remedy at law.  Moreover, this case involves several equitable claims in addition to the breach of contract claim.

Although the amount of money damages owed by the Plaintiffs can be calculated, the court concludes that a judgment against Plaintiffs after they have spent, transferred, and commingled the proceeds of the Tax Refunds would be "inadequate" to compensate JPMorgan and the other members of the Bank Group.  In particular, commingling of the Tax Refunds by the Plaintiffs may prevent the Bank Group from recovering the full amount owed due to the stringent tracing requirements for constructive trusts.  *See In re Servs., Inc.,* 284 B.R. 292, 296-98 (Bankr. Utah 2002) (discussing the stringent tracing requirements for constructive trusts imposed post-bankruptcy petition).  Accordingly, absent the requested injunction, the Bank Group may lose legal rights related to its constructive trust claim if the Tax Returns are commingled or spent by the Plaintiffs.  Thus, the court concludes that the imminent possibility of this irreparable harm occurring in this case is not merely speculative; it is a significant risk.  *See Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

Nilson and Arave previously committed, in connection with the Bankruptcy Cases, that they would not put the Tax Refunds outside the reach of creditors, but similar promises by Nilson and Arave were not clearly made in connection with this proceeding.  *See* Exhibits LL and MM; Dkt. Nos. 78 and 83.  Nilson and Arave also presented conflicting evidence on this point at the Preliminary Injunction Hearing.  Mr. Nilson admitted that the rationale for not

making such a commitment was because it would "change the dynamic" of the circumstances by preventing him from spending money on medical expenses, legal fees, and investment opportunities. *See* Nov. 20, 2009 Hr'g. Tr. at p. 563:11-21. Mr. Nilson, however, refused to set aside amounts for medical expenses and legal fees and agree to hold the balance of the Tax Refunds. *See* Nov. 20 2009 Hr'g. Tr. at pp. 563:22-534:25.

Mr. Arave testified that he would consider investing his Tax Refund in a new home building venture. Mr. Nilson at one time testified that he may consider a new home building venture and then testified that he had no interest in it given the litigation that has ensued. The testimony and representations at the hearing and in the filed declarations conflict to such a degree that the court finds it cannot reasonably rely on such representations in reaching its determinations. There was clear evidence presented that there are opportunities available in the local market with respect to properties well-known to these Plaintiffs and that there was generally no cash available to pursue such opportunities except for the Tax Refunds. *See* Nov. 19 2009 Hr'g. Tr. at pp. 304:19-308:25.

The evidence regarding Scott Nelson's potential involvement in a future homebuilding opportunity is not as clear. Mr. Nelson also testified that the tax refunds he has received are in a brokerage account and that he has the ability to pay any potential judgment with other funds.

Based on the above, as well as evidence that Plaintiffs have previously moved money out of the reach of the Bank Group creditors, the court concludes that there is a significant risk that, absent a preliminary injunction, Plaintiffs Nilson and Arave will spend all or part of the Tax Refunds or further commingle the tax refunds. If such were to occur, the court finds that JPMorgan and the other Defendants would be irreparably harmed if the Tax Refunds are not

frozen pending a final adjudication of this proceeding.  As to Plaintiff Nelson, however, the court concludes that there is not sufficient evidence to find irreparable harm.   Because JPMorgan and the Bank Group have not met their burden of demonstrating irreparable harm as to Plaintiff Scott Nelson, the court declines to issue a preliminary injunction freezing his tax refunds pending an adjudication on the merits.

### E.     Balancing of Harms

With respect to the balancing of the equities, the court finds that JPMorgan and the Bank Group have a strong interest in the Tax Refunds since they were triggered by the improper Tax Conversion and represent a repayment of the 2006-2007 Dividends.  Further, under *Grupo Mexicano*, *Deckert*, and their progeny, as discussed below, the court concludes that it is proper to issue injunctive relief in this case because JPMorgan and the Bank Group are claiming and have an equitable interest in the Tax Refunds; the Tax Refunds have a clear and close nexus to the ultimate relief sought; and the evidence demonstrates that if Plaintiffs Nilson and Arave are not enjoined, they would likely be unable to satisfy an adverse judgment rendered against them.  Again, such a finding is not appropriate with respect to Plaintiff Scott Nelson.

If an injunction is not issued in this case, the *status quo* is likely to be disrupted.  As stated above, both Nilson and Arave testified that they are unwilling to voluntarily hold the Tax Returns pending even an expedited trial on the merits, and may transfer, commingle, or invest the Tax Refunds after their employment with Woodside is terminated.  Should any Plaintiff dissipate the Tax Refunds, the Court finds that the *status quo* would certainly be disrupted, and by Plaintiffs' own accounts, JPMorgan would likely be unable to recover any judgment against them.

The evidence at the hearing was clear that none of the Plaintiffs needed the Tax Refund money for day-to-day living expenses.  Moreover, the Tax Refunds are the result of a Tax Conversion of the business structure of the companies of which Defendants were not notified even though the taxes were paid with dividends that may have been transferred to the individual Plaintiffs in contravention of the applicable agreements between the parties.  In his deposition in the Bankruptcy Cases, Mr. Nilson revealed that the Tax Conversion was effectuated, in part, to generate Tax Refunds that could be available to creditors in the event that the dividend distributions were found to be improper.  *See* Nov. 18, 2009 Hr'g. Tr. at pp. 188:3-189:10. The court does not find significant harm to Plaintiffs Nilson and Arave if the Tax Refunds are held in trust pending an expedited trial on the merits.

Accordingly, the Court concludes that the balancing of the equities weighs in favor of JPMorgan and the Bank Group as the continuing and threatened harm to JPMorgan and the Bank Group outweighs any perceived harm that a preliminary injunction would cause Plaintiffs Nilson and Arave.

*F.*     **Public Policy**

With respect to public policy factor, the court finds, as indicated above, that the Plaintiffs, who are savvy and sophisticated businessmen, freely executed the Senior Credit Agreement and Subordination Agreement, and thus, agreed to be bound by their respective terms.  In so doing, the Plaintiffs enjoyed the contractual benefits under each of those agreements for years, and received substantial distributions as indicated in Exhibit FF.  However, beginning as early as November 2006, the Plaintiffs wrongfully accepted distributions under the Subordination

Agreement due to the Events of Default that had occurred and were continuing under the Senior Credit Agreement.

Under these circumstances, the court concludes that issuing the requested injunction merely requires the Plaintiffs to comply with their own contractual obligations, and therefore furthers the public policy favoring enforcement of commercial contracts that have been freely entered into between sophisticated parties such as Woodside and the Bank Group.  Accordingly, the Court concludes that there is no public policy weighing against the issuance of a preliminary injunction.

### G.    Delay in Seeking Injunctive Relief

Plaintiffs have asserted that "the Bank's inordinate delay in asserting its purported rights disproves both that those rights ever existed and that urgent relief is required."  Opposition at p. 4.  The court has addressed this issue in connection with irreparable harm above.  But, in analyzing the matter more fully, the following factors have been considered by courts in this Circuit:  i) whether the delay was outcome determinative, thereby prejudicing the parties;[25] ii) whether the delay caused the very irreparable harm complained about;[26] and iii) whether the delay evidences a weak claim on the merits or the non-existence of irreparable harm, as suggested by Plaintiffs.[27]

---

[25] *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehabilitation Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994) (finding that the delay neither altered the outcome of the proceeding nor disadvantaged the defendants); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (finding that the delay had not disadvantaged any parties' interests).

[26] *GTE Corp. v. Williams*, 731 F.2d 676, 678-79 (10th Cir. 1984) (finding that plaintiff's ten-year delay in seeking an injunction to protect its trademark rights negated a finding of irreparable harm because plaintiffs had caused the very irreparable harm that they were complaining about).

[27] *Kan. Health Care Ass'n, Inc.*, 31 F.3d at 1543-44 (finding that the plaintiff's delay did not undermine plaintiffs' claim of such injury).

As an initial matter, Plaintiffs contend that they would be prejudiced due to JPMorgan's alleged two-and-a-half year delay in seeking injunctive relief. The applicable date for determining the length of any delay, however, is not when JPMorgan and the Bank Group became aware of the defaults under the Senior Credit Agreement, but rather when JPMorgan became aware that the payment of the Tax Refunds was imminent or that the Plaintiffs actually began to receive the Tax Refunds. The Court finds that there is no evidence that JPMorgan or any members of the Bank Group knew or should have known that the payment of the Tax Refunds was "imminent," and that the money at issue would be at risk, until just prior to filing the instant case. Until that time, it was unclear when or whether such Tax Refunds would be paid. *See* Nov. 20, 2009 Hr'g. Tr. at pp. 512:4-513:6. Further, any request for injunctive relief sought before payment of the Tax Refunds was "imminent," would have certainly resulted in defenses that actual refunds were too speculative to enjoin and/or that the preliminary injunction standards could not be met.

The facts further establish that any delay was not unreasonable because JPMorgan and the Bank Group sought injunctive relief: (1) after their attempts to settle the claims for the Tax Refunds and application of the Tax Refunds in the Woodside Bankruptcy case failed (the Court notes that a bankruptcy is a means of settling all of the creditors' claims and it is not unreasonable for the Bank Group to determine the relative success of these efforts before proceeding with this action);[28] and (2) after they discovered the Tax Refunds had been received by the Plaintiffs. *See Ute Indian Tribe of Unitah and Ouray Reservation v. Ute Distribution*,

---

[28] The Court notes that the Plaintiffs have acknowledged the ongoing settlement negotiations in their pleadings, and even sought to exclude the testimony from Mr. Aronzon, the Bankruptcy Court appointed Examiner, who served as a mediator in the Bankruptcy Cases. *See* Dkt. No. 77 at p. 18.

2006 WL 199776, *4-*5 (D. Utah, July 14, 2006) (Delay is not unreasonable and does not undercut a showing of irreparable harm when a party is attempting to settle or resolve the dispute prior to seeking injunctive relief). JPMorgan was not, at the time, notified of the Tax Conversion. Thus, JPMorgan was not aware of the Tax Refunds in July of 2008. Rather, JPMorgan first learned of the *potential* for the Tax Refunds at issue through the Examiner's investigation and Report that was filed with the Bankruptcy Court on December 15, 2008. *See* Exhibit F at ¶ 14; Exhibit N. Upon receipt of the Examiner's Report, Mr. Welch testified that JPMorgan began working with its financial consultants to determine when dividends were paid, how much those dividends were, who received those dividends, and to what extent Tax Refunds may be owed. *See* Nov. 19, 2009 Hr'g Tr. at pp. 386:21-387:6. Thereafter, JPMorgan and the Bank Group continued in their efforts in the Woodside Bankruptcy to reach an agreement with Plaintiffs concerning the application of the Tax Refunds as payment to the creditors in the bankruptcy case. *See* Nov. 20, 2009 Hr'g Tr. at pp. 512:9-518:22. After these efforts failed and JPMorgan discovered that the Tax Refunds would soon be available to satisfy any judgment, JPMorgan promptly sent Plaintiffs the Demand Letter, thus resulting in this lawsuit.[29]

 The court finds that regardless of whether this suit was brought two years ago or through the instant action, the result would be the same. In sum, the timing of the Bank Group's request for injunctive relief or this lawsuit would not change the Events of Default that occurred under the Senior Credit Agreement as of November 2006 or January 2007 and that continued through September 2007, or the improper dividend distributions that were paid to the Plaintiffs in

---

[29] The Court notes that prior to the Tax Refunds being received by the Plaintiffs irreparable harm did not exist based on possible commingling of funds and the possible resultant loss of being able to assert a claim for constructive trust based on the strict tracing requirements. *See In re Servs., Inc.,* 284 B.R. 292, 296-98 (Bankr. Utah 2002) (discussing the stringent tracing requirements for constructive trusts imposed post-bankruptcy petition).

violation of the Subordination Agreement.  The delay in actually adjudicating whether or not the Plaintiffs can spend the Tax Refunds would not cause any prejudice to the Plaintiffs—in fact, Plaintiffs have been afforded the benefit of holding the Tax Refunds and earning interest on these large sums of money despite the likelihood that this lawsuit will result in a judgment for those funds.  As a result, the court finds that because the outcome of this case would be unchanged, the Plaintiffs have not been prejudiced.

JPMorgan's delay in seeking injunctive relief has neither disadvantaged Plaintiffs nor altered the outcome of this proceeding.  *See RoDa Drilling Co.*, 552 F.3d at 1212 (finding that the delay in seeking the injunction had not disadvantaged the other party's interests); *see also Kan. Health Care Ass'n, Inc.*, 31 F.3d at 1543-44 (finding that the delay in that instance did not alter the outcome of the proceedings).

Courts considering delay in the context of a preliminary injunction hearing have also considered whether the delay caused the very irreparable harm complained about.  This is typical in misappropriation of trade secret cases where trade secrets are supposedly stolen by a competitor, but despite this alleged "imminent harm," the plaintiff delays bringing suit and causes the very harm complained about.  *See, e.g., GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir. 1984).  This case, however, unlike the *GTE* trade secret case, is not a situation where JPMorgan sat on its hands and caused its own harm.  Rather, the evidence presented at the hearing establishes that JPMorgan faces an imminent threat of harm if the Plaintiffs' spend the Tax Refunds and the Tax Refunds are unavailable to satisfy any adverse judgment or the Tax Refunds are commingled in such a way that a constructive trust cannot be fashioned.  This harm

to JPMorgan and the members of the Bank Group has not yet occurred but is significant in light of the evidence presented.

Plaintiffs have further asserted that JPMorgan's delay was caused by JPMorgan's own lack of confidence with respect to the merits of its Counterclaims. The court finds that this argument lacks merit. JPMorgan sent its Demand Letter to Plaintiffs once it became aware that the Plaintiffs would likely be receiving large Tax Refunds in the coming weeks. The court concludes that the delay by JPMorgan in seeking injunctive relief does not evidence a weak claim and that any delay by JPMorgan in bringing this action does not negate the irreparable harm established by other evidence.

**H.      JPMorgan's Counterclaims Seeking Equitable Relief Provide Authority for Preliminary Injunction**

In cases seeking money damages, courts generally lack authority to issue a preliminary injunction preventing a party from disposing of its assets pending the adjudication of the contract claim, unless the party also has an equitable interest in the funds at issue. Compare *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) (plaintiff was seeking money damages only, not equitable relief) with *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (equitable relief sought).

In *Grupo Mexicano*, certain American investment funds purchased unsecured, guaranteed notes issued by Grupo Mexicano, a Mexican holding company and toll road operator. 527 U.S. at 310. After Grupo Mexicano encountered financial troubles and missed an interest payment on the notes, the Funds accelerated the principal amounts of the notes and filed a breach of contract suit for damages representing the amount allegedly due. *Id.* at 311-12. The Funds, alleging that the holding company was at risk of insolvency and that the company's planned transfer of certain

44

assets would frustrate any judgment that the funds could obtain against the company, requested, while the breach of contract action was pending, a preliminary injunction restraining the company from transferring these assets.  *Id.* at 312.  After issuing a temporary restraining order preventing the transfer of the assets, the district court preliminarily enjoined the company from disposing of the assets.  The Second Circuit affirmed.  *Id.* at 312-13.  The Supreme Court reversed and remanded, holding that "the district court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' *contract claim* for money damages."  *Id.* at 333 (emphasis added).  Thus, the Supreme Court carefully limited its holding to cases in which equitable assistance is sought merely in the collection of a legal debt, as opposed to cases in which equitable relief is sought as part of equitable causes of action that have been pleaded.

The Supreme Court's ruling in *Grupo Mexicano* was "entirely consistent" with its prior ruling in *Deckert*.  *See id.* at 324.  In addition, the *Grupo Mexicano* Court referenced but chose not to overrule *Deckert*.  *Id.*  In *Deckert*, purchasers of certificates that entitled the holders to invest in a trust of common stocks sued the company that sold the certificates and the company administering the trust, and related officers and affiliates, under the Securities Act of 1933, alleging that the sale was fraudulent.  311 U.S. at 285.  The petitioners further alleged that the company that sold the certificates was insolvent, that it was likely to make preferential payments to certain creditors, and that its assets were in danger of dissipation.  *Id.*  The petitioners sought the appointment of a receiver and an injunction restraining the company administering the trust from transferring any assets of the corporations or of the trust.  *Id.*  The district court preliminarily enjoined the company from transferring a fixed sum.  *Id.* at 286.  The Court of

Appeals reversed.  *Id.* The Supreme Court, after determining that the Securities Act permitted equitable relief, affirmed the district court's power to issue the injunction, acknowledging that the "principal objects" of the suit were the equitable remedies of rescission and restitution and that the asset freezing injunction was proper as it was "in aid of the recovery sought by the bill." *Id.* at 289.

Consistent with this line of Supreme Court precedent, several courts have issued asset freezing injunctions in "mixed" cases, like this one, where both equitable and legal remedies are sought, and which further clarify what is required by the "close and clear" nexus standard.  *See Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) (asset freezing injunction issued in ERISA case); *Animale Group, Inc. v. Sunny's Perfume, Inc.*, 256 F. App'x 707, 708 (5th Cir. 2007) (in "mixed" cases, *Grupo Mexicano* does not preclude issuance of an injunction preserving the parties' positions pending a trial on the merits); *In re Focus Media*, 387 F.3d 1077, 1085 (9th Cir. 2004) (*Grupo Mexicano* does not prohibit a preliminary injunction in a case where the party has pleaded causes of action for fraudulent conveyance and constructive trust [equitable and monetary claims], and where the relief ultimately sought includes money damages and imposition of a constructive trust.  In fact, "*Grupo Mexicano* . . . exempts from its proscription against preliminary injunctions freezing assets cases . . . in which equitable relief is sought."); *United States v. Oncology Assocs., P.C.*, 198 F.3d 489, 496 (4th Cir. 1999) ("when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested. This nexus between the assets

46

sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets.").

The court concludes that when a creditor asserts an equitable claim to a debtor's specific assets, and seeks a remedy to recover specific assets, the court may, in the interim, invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate, and the preliminary relief would further the court's ability to grant the final relief requested. *See RoDa Drilling*, 552 F.3d at 1208. As a result, and as a means of preserving the *status quo* in this case, the court concludes that it is authorized to enjoin the dissemination, disposal and spending of the Tax Refunds because JPMorgan's Counterclaims seek various forms of equitable relief. *See, e.g.*, *Oncology Assocs.*, 198 F.3d at 496 (holding that a preliminary injunction was a reasonable means of preserving the *status quo*, and was of the same character as the ultimate relief sought, when a few, but not all, of the causes of action in the complaint were of an equitable nature, including causes of action for unjust enrichment and imposition of constructive trust).

## I.      Nexus of Equitable Claims To the Assets Sought To Be Enjoined

Finally, contrary to the Plaintiffs' assertions, JPMorgan's and the Bank Group's equitable claims seeking the full recovery of the Tax Refunds have a clear and close nexus to the assets they seek to enjoin in this preliminary injunction proceeding (*i.e.*, the Tax Refunds). This conclusion is based, in part, on the undisputed testimony that the Tax Refunds: i) are in large part a return of monies wrongfully paid by Woodside to Plaintiffs in violation of the Subordination Agreement; and ii) result from a Tax Conversion that was secretly and improperly effectuated in

breach of the Senior Credit Agreement.  *See* Nov. 19, 2009 Hr'g. Tr. at pp. 369:20-370:10; Nov.
18 2009 Hr'g. Tr. at p. 132:21-132:24.

As a subchapter S-corporation, income generated by Woodside was "passed through" and
attributed to its shareholders for tax purposes.  *See* Nov. 19, 2009 Hr'g. Tr. at p. 236:1-236:6;
*and* Exhibit N at p. 1.  Thus, Woodside paid quarterly dividends to its shareholders (*i.e.*, the
Plaintiffs) for the primary purpose of allowing shareholders to satisfy their tax obligations with
respect to Woodside income.  *See* Nov. 19 2009 Hr'g. Tr. at p. 236:1-236:3.  Many shareholders
also received dividend payments that were materially above their tax liabilities mainly because
of differing tax rates between the states in which Woodside conducted business and its practice
of calculating dividend payments based on the highest state tax rate.  *See* Exhibit N at p. 9.  In
fact, from 2006 through 2007, Woodside/Pleasant Hill distributed over $234 million in
shareholder dividends (the "2006-2007 Dividends").  *Id.* at p. 16.

As discussed above, on July 25, 2008, Plaintiffs approved and effectuated the Tax
Conversion.[30]  Because this Tax Conversion constituted a liquidation for tax purposes of
Woodside's assets at a time when the assets had a value significantly lower than Woodside's tax
basis in those assets, the Tax Conversion created significant tax losses that flowed through to the
Plaintiffs' due to the "pass-through" nature of the subchapter S-corporations.[31]  As such, the
Plaintiffs were permitted to "carry back" the tax losses created by the Tax Conversion against
income that was earned in 2006 and 2007.[32]  In total, the Tax Conversion triggered in excess of

---

[30] *See* Exhibit N at p. 35.

[31] *Id.* at pp. 3-4, 35.

[32] *Id.* at pp. 7, 41 ("Management admitted that the Conversion was driven principally by the goal of obtaining large tax refunds for the Shareholders, and that the Shareholders did not contemplate contributing such refunds to the Company.").

$500 million in losses that could be carried back, thereby generating approximately $110 million in federal tax refunds, in addition to any potential state tax refunds (collectively, the "Tax Refunds"), of payments made by Pleasant Hill to taxing authorities for the purpose of paying the Plaintiffs' personal tax liabilities.[33]

Importantly, the Tax Conversion was effectuated, in part, to generate Tax Refunds that could be available to creditors in the event that the dividend distributions were found to be improper. *See* Nov. 18, 2009 Hr'g. Tr. at pp. 188:3-189:10. Thus, in a very real sense, the Tax Refunds were ear-marked to be paid to the creditors, including the Bank Group, should liability exist in connection with the creditors' claims against the management of Woodside.

Accordingly, the court finds that these Tax Refunds represent, in large part, a repayment of the dividends that were distributed to Plaintiffs in violation of the Subordination Agreement. In this regard, Plaintiffs Nilson, Arave, and Nelson testified that they, together with the Plaintiff Trusts, have or will receive over $60 million of this $110 million:

- Mr. Nilson received federal tax refunds totaling $58,927,324. Mr. Nilson has also applied for but has yet to receive state tax refunds in the following amounts: Arizona, $435,961 and $14,190; Maryland $43,007 and $0 (not applied for); Minnesota $141,882 and $1,730; Utah $740,689 and $13,889; and Virginia $73,587 and $0 (not applied for). *See* Dkt. No. 78 at ¶ 57; *see also* Exhibit BB (stipulating as to certain Tax Refunds).

- Mr. Arave received federal tax refunds totaling $1,231,778. Mr. Arave has also received, or has applied for but has yet to receive state tax refunds in the following amounts: Arizona $4,378.00 and $0; Maryland $549.00 and $0; Minnesota $1,974.00 and $0; Utah $129,645.00 and $40,503.00; and Virginia, $791.00 and $0. *See* Dkt. No. 83 at ¶ 67.

- Mr. Nelson has applied for, but has yet to receive, federal tax refunds of $5,411,829. Mr. Nelson has also received or applied for, but has yet to receive,

---

[33] *Id.*

state tax refunds in the following amounts:  Arizona, $32,802 and $624; Maryland $3,489 and $0 (not applied for); Minnesota $11,583 and $0 (not applied for); Utah $602,620 and $215,469; and Virginia $5,947 and $0 (not applied for).  *See* Dkt. No. 79 at ¶ 25.

Woodside did not obtain JPMorgan's or the Bank Group's consent to effectuate the Tax Conversion, and Woodside deliberately failed to notify the Bank Group of their intentions to implement the same.  Nov. 19, 2009 Hr'g. Tr. at p. 368:9:17.  These actions likely constituted an Event of Default under the Senior Credit Agreement.  *See* Exhibit O at pp. 186:17-190:8; *see also* Exhibit N at p. 41-43; Senior Credit Agreement at §§ 5.2.4 (requiring the Borrowing Group to provide JPMorgan with notice of any "Material Adverse Effect"), 5.4, 6.3.

Plaintiffs admitted that a significant reason for not seeking consent of the Bank Group was their understanding that the Bank Group would have likely required any Tax Refunds to be returned to Woodside.  *See* Nov. 19, 2009 Hr'g. Tr. at pp. 368:9:17; 369:3:10.  Accordingly, Plaintiffs intentionally concealed the Tax Conversion.  As a result of these actions, Plaintiffs now stand to benefit exclusively from the Tax Refunds that were generated by the Tax Conversion where, if they had simply complied with their obligations, the Tax Refunds generated, if any, would have gone to the Bank Group.

Based on the above, and contrary to Plaintiffs' allegations that "this Court has jurisdiction, at most, to issue injunctive relief with respect to only a fraction of the tax refunds at issue," the court concludes that a close nexus exists with respect to the Tax Refunds that the Bank Group seeks to enjoin and the asserted counterclaims.  Therefore, injunctive relief is appropriate.

**J.**      **Declaration and Report of F. Wayne Elggren**[34]

Plaintiffs have proffered Mr. Elggren as an expert on several topics, the vast majority of which focus on i) adding certain "Costs" that were supposedly not captured by Woodside's ordinary course accounting records (and that Mr. Elggren states were not included in the Borrowing Base Certificates submitted by Woodside over two years ago), and ii) reclassifying assets that Woodside originally included in the assets subject to the 60% Limitation to other categories of assets because, he asserts, such assets are either a) subject to "Ratified Contracts" at the relevant times and therefore should have been classified as "pre-sold units," or b) were wrongly classified because construction had commenced on the land such that they should be classified in other, non-60% Limitation categories.  *See, e.g.,* Plaintiffs' Exhibit 19.

Using Len Arave's excel spreadsheets containing the data on which Elggren now relies, Mr. Elggren then attaches to his Report certain "Restated Borrowing Base Reports" (sometimes referred to as "Restated Borrowing Base Certificates"), that Plaintiffs and Elggren assert demonstrate there was no Event of Default or no "material" Events of Default by the Borrower in connection with the Senior Credit Agreement.

The Court finds that these opinions are flawed in several material respects, including for the following reasons:

- Nothing in the Senior Credit Agreement allows the Borrower to submit Restated Borrowing Base Reports or Certificates years after these deadlines.  *See* Exhibit KKKKK at ¶¶ 26-31.

- A borrower is not allowed to revise and re-classify these certificates or the information contained in them some months after the certificates were due

---

[34] Mr. Elggren's direct testimony was offered via his declaration, which was filed with the Court on November 11, 2009.  Dkt. No. 81.  The cross-examination of Mr. Elggren was conducted via JPMorgan's Motion to Strike which the Court agreed to consider in lieu of a "live" cross-examination.

because it puts parties at risk with respect to prior lending decisions based on the borrowing certificates regarding the amount of the Available Commitment and what assets of the Borrower were to be considered for purposes of calculating borrowing bases that were supposed to be in effect months, or in this case, years earlier.  *See* Exhibit KKKKK at ¶¶ 26-13.

* The reclassified costs from the 60% Limitation categories to other less restricted categories was based on analyses performed by Mr. Arave, with total re-classified costs provided to Mr. Elggren without Elggren performing any tests or analyses to determine if any "Ratified Contracts" actually existed or whether construction had actually "commenced" as suggested by Mr. Arave.  In fact, none of this information was tested and confirmed by Elggren.  Moreover, there is no evidence supporting Arve's analyses.  Elggren Deposition at p. 109:1-112:11.[35]

* Mr. Elggren created nine months of Restated Borrowing Base Reports, seven of which were spreadsheets that contained data that was simply imported from Excel spreadsheets provided by Mr. Arave.  The "Step 1" cost numbers included by Elggren in his Restated Borrowing Base Reports were, like the reclassified costs, taken from Arave's summary analyses without any testing or review of underlying invoices or other documents to test whether any of them were accurate or reliable.  *Id.* at p. 87:2-4, pp. 88:10-89:4, pp. 90:12-91:11, p. 97:8-16 and pp. 122:20-123:8.

* The other two months of Restated Borrowing Base Reports did include an additional analysis performed by Elggren, but Elggren's work in this regard was based on one month of invoices (December 2007—*i.e.*, a month not at issue herein) that resulted in a "30% estimate" of extra costs that he says should have been included in the Borrowing Base calculations.  Mr. Elggren admits, however, that he has done nothing to determine if this estimate is in any way statistically reliable because he says there are simply too few data points to do a statistical analysis.  *Id.* at p. 92:5-11, p. 93:11-25 and p. 95:3-8.

* Mr. Elggren concedes that while he adds certain "Costs" to the Borrowing Base calculations, he has failed to assess whether any other assets should be removed from the calculations, including land that has been sold and escrow receivables that may diminished during the relevant time frame.  *Id.* at p. 80:17-21, pp. 81:12-82:10, and p. 114:2-14.  Mr. Elggren also concedes that both of these categories of assets could significantly impact his "Costs" opinions.  *Id.*

---

[35] The deposition references contained herein are attached to the Supplemental Appendix to JPMorgan's Motion to Strike, filed on December 3, 2009.  As referenced above, the Court agreed to consider JPMorgan's Motion to Strike in lieu of a "live" cross-examination.

Mr. Elggren's other opinions are assessments of materiality and other opinions of banking practices.  While Mr. Elggren is a Certified Public Accountant with substantial experience and expertise in public accounting and financial analysis, he has no expertise in banking and lending practices.  Accordingly, the Court affords Mr. Elggren's declaration and report reduced weight in the context of this preliminary injunction motion.

*K.*      **Bond**

Given the evidence presented at the Preliminary Injunction Hearing that JPMorgan and the Bank Group will likely prevail on the merits with respect to each of their Counterclaims, and in light of Plaintiffs' ability to hold and retain the Tax Refunds thus accruing interest thereon pending trial, the Court finds that a bond in the amount of $100,000 is appropriate.

<u>**CONCLUSION**</u>

Based on the above, the Court concludes that the evidence presented at the Preliminary Injunction Hearing supports that: (1) the Bank Group has a likelihood of success on the merits; (2) the Bank Group will suffer irreparable harm in the absence of preliminary injunctive relief against Plaintiffs Nilson and Arave; (3) the balance of equities weighs in favor of the Bank Group; and (4) the granting of an injunction is not contrary to the public interest.  Moreover, the Court concludes that the Bank Group's equitable claims have a clear and close nexus to the assets sought to be enjoined (*i.e.*, the Tax Refunds).  JPMorgan and the Bank Group, however, have not met their burden of demonstrating irreparable harm and the balance of equities with respect to Plaintiff Scott Nelson.

## <u>ORDER</u>

Accordingly, the Court concludes that a preliminary injunction is and shall be in place pending final adjudication of this proceeding.  The preliminary injunction restrains and enjoins Plaintiffs Nilson and Arave, and all those acting in concert with them, including all heirs, legal representatives, successors and assigns, from disseminating, transferring and/or otherwise disposing of or spending any of the Tax Refunds already received or to be received, in an amount equal to all distributions made by the Woodside Group, LLC (or its predecessor entity), Pleasant Hill Investments, LC, and other members of the Borrowing Group, including any "loan re-payments" made by Alameda Investments (Delaware), LLC or Liberty Holding Group, LLC, directly or indirectly, to or for the benefit of Plaintiffs in the calendar year 2007.

The court sets an expedited trial in this matter to begin on May 17, 2010.  Within thirty days, the parties are instructed to file contemporaneous memoranda on the issue of whether the trial shall be a jury or bench trial and the anticipated length of trial.  Each party may then file reply memoranda within fifteen days of the initial briefs.  The parties shall file any dispositive motions by February 26, 2010.  All fact discovery shall be completed by February 19, 2010.

DATED this 22d day of December, 2009.

BY THE COURT:

DALE A. KIMBALL,
United States District Judge