FILED
U.S. DISTRICT COURT

2010 MAY 17  P 4: 18

DISTRICT OF UTAH

BY: _____
       DEPUTY CLERK

RICHARD S. KRUMHOLZ (*Pro Hac Vice*)
Texas Bar No. 00784425
KRISTIN R. TURNER (*Pro Hac Vice*)
Texas Bar No. 24049549
REBECCA O. MILNE (*Pro Hac Vice*)
Texas Bar No. 24056904
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200
E-mail: rkrumholz@fulbright.com
E-mail: kturner@fulbright.com
E-mail: rmilne@fulbright.com

SHANE D. HILLMAN (8194)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 532-1234
Facsimile:  (801) 536-6111
E-mail: shillman@parsonsbehle.com

Attorneys for JPMorgan Chase Bank, N.A.,
Individually and as Administrative Agent

ANNETTE JARVIS (1649)
CAMERON M. HANCOCK (5389)
PEGGY HUNT (6060)
DORSEY & WHITNEY LLP
136 South Main, Suite 1000
Salt Lake City, Utah 84101
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: Jarvis.Annette@Dorsey.com
Email: Hancock.Cameron@Dorsey.com
Email: Hunt.Peggy@Dorsey.com

Attorneys for Wells Fargo Bank, N.A.,
Wachovia Bank, N.A., and U.S. Bank National
Association

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| EZRA K. NILSON, *et al.*,<br><br>     Plaintiffs,<br><br>vs.<br><br>JPMORGAN CHASE BANK, N.A.,<br>Individually and as Administrative Agent, *et al.*,<br><br>     Defendants. | **DEFENDANTS/COUNTER-PLAINTIFFS JPMORGAN CHASE BANK, N.A.'S (INDIVIDUALLY AND AS ADMINISTRATIVE AGENT), WELLS FARGO BANK NATIONAL ASSOCIATION'S, WACHOVIA BANK N.A.'S, AND U.S. BANK NATIONAL ASSOCIATION'S THIRD-PARTY COMPLAINT AND REQUEST FOR PERMANENT INJUNCTION** |

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A., Individually and as Administrative Agent, *et al.*, | Case No. 1:09-CV-00121-DAK-BCW |
| Counter-Plaintiffs, | Judge: Dale A. Kimball |
| vs. | Magistrate Judge: Brooke C. Wells |
| ABBY NILSON CROCKETT, DAVID CROCKETT, BENJAMIN EZRA NILSON, BRETT NILSON URE, SETH JONATHAN URE, JESSICA NILSON COSGRAVE, MICHAEL COSGRAVE, JOY NILSON HAYWOOD, ANDREW HAYWOOD, NELLIE JO NILSON PUGSLEY and NATHAN WALTON PUGSLEY, | |
| Counter-Defendants. | |

JPMorgan Chase Bank, N.A., individually and as administrative agent ("JPMorgan"), Wells Fargo Bank N.A., Wachovia Bank N.A., and U.S. Bank N.A. (collectively, the "Defendants" or "Counter-Plaintiffs") file this *Third-Party Complaint And Request For Permanent Injunction* (the "Third-Party Complaint") *Against Additional Counter-Defendants* Abby Nilson Crockett, David Crockett, Benjamin Ezra Nilson, Brett Nilson Ure, Seth Jonathan Ure, Jessica Nilson Cosgrave, Michael Cosgrave, Joy Nilson Haywood, Andrew Haywood, Nellie Jo Nilson Pugsley and Nathan Walton Pugsley (collectively, "Counter-Defendants"), and in support thereof respectfully alleges as follows:

## PARTIES

1.      Defendant/Counter-Plaintiff JPMorgan Chase Bank, N.A. is a national banking association with its "main office" in Columbus, Ohio and, as such, is a citizen of the State of Ohio.

2.      Defendant/Counter-Plaintiff Wells Fargo N.A. is a national banking association, with its principal place of business in Sioux Falls, South Dakota and, as such, is a citizen of the State of South Dakota.

3.      Defendant/Counter-Plaintiff U.S. Bank N.A. is a national banking association, with its principal place of business in Cincinnati, Ohio and, as such, is a citizen of the State of Ohio.

4.      Defendant/Counter-Plaintiff Wachovia Bank N.A. is a national banking association, with its principal place of business in Charlotte, North Carolina and, as such, is a citizen of North Carolina.

5.      On information and belief, Counter-Defendant Abby Nilson Crockett f/k/a Abby Nilson ("Abby Crockett") is a resident of Clark County, Nevada and citizen of the State of Nevada.  Abby Crockett is a beneficiary, successor and/or assign of the Abby Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

6.      On information and belief, Counter-Defendant David Crockett ("David Crockett") is a resident of Clark County, Nevada and a citizen of the State of Nevada.

7.      On information and belief, Counter-Defendant Benjamin Ezra Nilson ("Benjamin Nilson") is a resident of Davis County, Utah and a citizen of the State of Utah.  Benjamin Nilson is a beneficiary, successor and/or assign of the Benjamin Ezra Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

8.      On information and belief, Counter-Defendant Brett Nilson Ure f/k/a Brett Nilson ("Brett Ure") is a resident of Clark County, Nevada and a citizen of the State of Nevada.  Brett

Ure is a beneficiary, successor and/or assign of the Brett Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

9.      On information and belief, Counter-Defendant Seth Jonathan Ure ("Seth Ure") is a resident of Clark County, Nevada and a citizen of the State of Nevada.

10.     On information and belief, Counter-Defendant Jessica Nilson Cosgrave f/k/a Jessica Nilson ("Jessica Cosgrave") is a resident of Utah County, Utah and a citizen of the State of Utah.  Jessica Cosgrave is a beneficiary, successor and/or assign of the Jessica Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

11.     On information and belief, Counter-Defendant Michael Cosgrave ("Michael Cosgrave") is a resident of Utah County, Utah and a citizen of the State of Utah.

12.     On information and belief, Counter-Defendant Joy Nilson Haywood f/k/a Joy Nilson ("Joy Haywood") is a resident of Davis County, Utah and a citizen of the State of Utah. Joy Haywood is a beneficiary, successor and/or assign of the Joy Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

13.     On information and belief, Counter-Defendant Andrew Haywood ("Andrew Haywood") is a resident of Davis County, Utah and a citizen of the State of Utah.

14.     On information and belief, Counter-Defendant Nellie Jo Nilson Pugsley f/k/a Nellie Jo Nilson ("Nellie Pugsley") is a resident of Davis County, Utah and a citizen of the State of Utah.  Nellie Pugsley is a beneficiary, successor and assign of the Nellie Jo Nilson Trust, created and administered under Utah law, and has accepted distributions from same.

15.     On information and belief, Counter-Defendant Nathan Walton Pugsley ("Nathan Pugsley") is a resident of Davis County, Utah and a citizen of the State of Utah.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1332.  This Court has personal jurisdiction over all Counter-Defendants, the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, and the controversy is between citizens of different states.

17.     Counter-Plaintiffs are citizens of the States of Ohio, North Carolina and South Dakota.

18.     Counter-Defendants Benjamin Nilson, Jessica Cosgrave, Michael Cosgrave, Joy Haywood, Andrew Haywood, Nellie Pugsley and Nathan Pugsley are citizens of the State of Utah.  Abby and David Crockett and Brett and Seth Ure are citizens of the State of Nevada.

19.     Counter-Defendants Abby Crockett and Brett Ure are beneficiaries, successors and/or assigns of the Abby Nilson Trust and the Brett Nilson Trust, respectively, both of which sued Defendants in the present case.  Both trusts were created and administered under Utah Law, and both Abby Crockett and Brett Ure have routinely received and accepted the wrongful distributions from Utah bank accounts and entities—*i.e.*, Woodside and Pleasant Hill.  As such, Counter-Plaintiffs' causes of action arise from and are directly related to the contacts of both Abby Crockett and Brett Ure with the State of Utah and both have submitted personally to the jurisdiction of the State of Utah and are subject to the jurisdiction of the courts of Utah.  UTAH CODE ANN. § 75-7-202.

20.     Similarly, on information and belief, Mr. Crockett and Mr. Ure are both subject to general and specific jurisdiction in Utah.  Both Mr. Crockett and Mr. Ure shared with their spouses (Abby and Brett) control and ownership of bank and/or investment accounts, deposits

into which included wrongfully distributed dividends from the Utah bank accounts of Woodside and Pleasant Hill, and Tax Refunds related thereto.[1]   As such, Counter-Plaintiffs' causes of action for unjust enrichment and specific performance arise from and are directly related to the contacts of both Mr. Crockett and Mr. Ure with the State of Utah.  Further, Counter-Defendants David Crockett and Seth Ure also have sufficient minimum contacts with the State of Utah and therefore are subject to the general jurisdiction of this Court.

21.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1441.

## SUMMARY OF ALLEGATIONS

22.     The individual Plaintiffs in this lawsuit are all current and/or former executives of Woodside Group, LLC ("Woodside Group"), Pleasant Hill Investments, LC ("Pleasant Hill") and various of their affiliated entities (collectively, "Woodside").   Certain of the individual Plaintiffs also serve or have served as trustees of the various Family Trusts.[2]   The Counter-Defendants herein are (i) the heirs, legal representatives, successors and/or assigns to certain of the Subordinated Lenders under the Subordination Agreement; (ii) beneficiaries, successors and/or assigns of certain of the Family Trusts; and/or (iii) spouses of said beneficiaries, successors and/or assigns who, on information and belief, had access to and shared control of bank and/or investment accounts where wrongful distributions from Woodside and Pleasant Hill to the Family Trusts were made, and where certain Tax Refunds have been deposited.

23.     On May 5, 2006, the Defendants and Plaintiffs entered into a Senior Credit Agreement and a Subordination Agreement which together allowed Woodside Group, Pleasant

---

[1] On information and belief, Mr. Crockett and Mr. Ure were at all times relevant to this Third-Party Complaint, acting on behalf of themselves and their marital property, including the Family Trusts, which were settled and/or governed under Utah law.
[2] All capitalized terms not otherwise defined in this Summary are defined below.

Hill and various of their affiliates (which are privately held home builders in the Western United States) to access a revolving line of credit of $620 million. These agreements, however, expressly prohibited Woodside and Pleasant Hill from making transfers of money to Plaintiffs (including the Family Trusts) if there was an Event of Default that occurred and was continuing under the Senior Credit Agreement.

24.     Numerous Events of Default occurred under the Senior Credit Agreement as early as November 2006 and have been ongoing. Despite these defaults, the Plaintiffs caused Woodside Group/Pleasant Hill to distribute over $60 million in dividends (the "Dividends") to or for the benefit of themselves, their Family Trusts, and other wholly controlled entities – all in violation of the Subordination Agreement given the Events of Default under the Senior Credit Agreement. Specifically, Woodside and Pleasant Hill declared and distributed in excess of $18 million in Dividends to the Family Trusts – the beneficiaries, successors and/or assigns of which include the Counter-Defendants.

25.     Through this Third-Party Complaint, the Counter-Plaintiffs seek recovery of these funds that rightfully belong to them and that were wrongfully transferred to and/or for the benefit of the Counter-Defendants in breach of the Subordination Agreement. Counter-Plaintiffs also seek actual damages, as well as their attorneys' fees and costs in connection with this Third-Party Complaint.

## FACTS

**A.     The Woodside Entities And The Family Trusts.**

26.     Woodside Group, LLC f/k/a Woodside Group, Inc. ("Woodside Group") and its affiliated entities (collectively, "Woodside") was founded by its principal, Ezra Nilson, in 1977.

Over time, Woodside grew into a major privately owned developer of residential real estate, with operations throughout the United States, including Texas, Arizona, Florida, Minnesota, Nevada, Maryland and Utah.

27.     Mr. Nilson has six children – Benjamin Nilson, Abby Crockett, Brett Ure, Jessica Cosgrave, Joy Haywood and Nellie Pugsley – each of whom are beneficiaries, successors and/or assigns of certain trusts created in their name and purportedly administered by Mr. Lenoard ("Len") Arave, as trustee (collectively, the "Family Trusts").[3]

28.     Approximately 95% of Woodside Group's shares are held by its three senior officers and managers, Mr. Ezra Nilson, Mr. Arave, and Mr. Scott Nelson, and Mr. Nilson's relatives and the related Family Trusts.  In particular, on information and belief:

(a)     Mr. Nilson owns 53.8017% of the outstanding interests of Woodside Group and 53.8242% of the outstanding interests of Pleasant Hill.

(b)     Mr. Arave owns 0.8949% of Woodside Group and 0.8949% of Pleasant Hill.

(c)     Mr. Nelson owns 5.1165% of the outstanding interests of Woodside Group and 5.1165% of the outstanding interests of Pleasant Hill.

(d)     Abby Crockett, either individually and/or as beneficiary of the Abby Nilson Trust, owns 4.6348% of the outstanding interests of Woodside Group and 4.6258% of the outstanding interests of Pleasant Hill.

(e)     David Crockett owns 0.0652% of the outstanding interests of Woodside Group and 0.0652% of the outstanding interests of Pleasant Hill.

(f)     David Crockett and Abby Crockett jointly own 0.0421% of the outstanding interests of Woodside Group and 0.0421% of the outstanding interests of Pleasant Hill.

---

[3] While Mr. Arave is identified in the Subordination Agreement as trustee for the Benjamin Nilson Trust, Mr. Ezra Nilson (a Plaintiff in this action) has asserted in Woodside's bankruptcy proceeding that he is the trustee for the Benjamin Ezra Nilson Trust.  *See* Bankr. Adv. Proc. No. 6:09-ap-01453-PC (C.D. Cal.) at Dkt. No. 27, p. 35.

(g)     Benjamin Ezra Nilson, either individually and/or as beneficiary of the Benjamin Ezra Nilson Trust, owns 4.5190% of the outstanding interests of Woodside Group and 4.5190% of the outstanding interests of Pleasant Hill.

(h)     Brett Ure, either individually and/or as beneficiary the Brett Nilson Trust, owns 4.4333% of the outstanding interests of Woodside Group and 4.4243% of the outstanding interests of Pleasant Hill.

(i)     Seth Ure individually owns 0.0703% of the outstanding interests of Woodside Group and 0.0703% of the outstanding interests of Pleasant Hill.

(j)     Brett Ure and Seth J. Ure jointly own 0.3888% of the outstanding interests of Woodside Group and 0.3888% of the outstanding interests of Pleasant Hill.

(k)     Jessica Cosgrave, either individually and/or as beneficiary of the Jessica Nilson Trust, owns 4.5689% of the outstanding interests of Woodside Group and 4.5599% of the outstanding interests of Pleasant Hill.

(l)     Michael Cosgrave owns 0.0544% of the outstanding interests of Woodside Group and 0.0544% of the outstanding interests of Pleasant Hill.

(m)     Joy Haywood, either individually and/or as beneficiary of the Joy Nilson Trust, owns 4.4962% of the outstanding interests of Woodside Group and 4.4872% of the outstanding interests of Pleasant Hill.

(n)     Andrew B. Haywood owns 0.0192% of the outstanding interests of Woodside Group and 0.0192% of the outstanding interests of Pleasant Hill.

(o)     Nellie Pugsley, either individually and/or as beneficiary of the Nellie Jo Nilson Trust, owns 4.0066% of the outstanding interests of Woodside Group and 3.9976% of the outstanding interests of Pleasant Hill.

(p)     Nathan W. Pugsley owns 0.0703% of the outstanding interests of Woodside Group and 0.0703% of the outstanding interests of Pleasant Hill.

**B.      Woodside's Financing And Applicable Loan Documents.**

29.     The operations of Woodside are financed primarily through Woodside Group's affiliate, Pleasant Hill Investments, LC ("Pleasant Hill"), which (according to Plaintiffs) operated

as a "clearinghouse" for all of the Woodside entities.  Accordingly, on May 5, 2006, JPMorgan, as Administrative Agent for certain lenders (collectively, the "Bank Group"), and Pleasant Hill entered into a Senior Credit Agreement (the "Senior Credit Agreement"), pursuant to which, among other things, the Bank Group agreed to make revolving loans available to Pleasant Hill in an aggregate amount not to exceed $620 million (the "Revolving Loan").  The Revolving Loan was later increased to $660 million.

30.    At the time the Senior Credit Agreement was entered into, it was anticipated that the Plaintiffs may attempt to make distributions to themselves and/or to their relatives, including the Family Trusts.  In contemplation of these potential distributions, Pleasant Hill, Woodside Group, the Plaintiffs and JPMorgan (as Administrative Agent), among others, entered into a Continuing Subordination And Standstill Agreement (the "Subordination Agreement"), under which the "Borrowing Group"[4] was permitted to make distributions to the "Subordinated Lenders"[5] only if certain terms and conditions were met, including principally that no Default or Event of Default existed and was continuing under the Senior Credit Agreement.  In particular, Section 2 of the Subordination Agreement provides:

> **Restriction of Payment of Subordinated Debt,[6] Disposition of Payments Received by Subordinated Lender.**  The members of the Borrowing Group <u>will not make, and Subordinated Lender will not accept or receive, any payment or benefit in cash or otherwise (or exercise any right of, or permit any set-off with respect to, the Subordinated Debt), directly or indirectly</u>, on account of any

---

[4] The Subordination Agreement defined the "Borrowing Group" to include Pleasant Hill, Woodside Group, and various other related entities as identified in an exhibit, Exhibit A, attached to the agreement.

[5] The Subordination Agreement defined "Subordinated Lenders" to include, among others, the Plaintiffs in this action.

[6] "Subordinated Debt" is defined broadly under the Subordination Agreement to include any·and all "indebtedness and other *obligations of every type and nature* owed by members of the Borrowing Group [including Woodside Group and Pleasant Hill] to the Subordinated Lenders [*i.e.*, the Plaintiffs]."  Subordination Agreement at § 1(a) (emphasis added).

amounts owing on the Subordinated Debt, provided, however, the members of the Borrowing Group may make, and Subordinated Lender may accept, Permitted Payments (hereinafter defined), if and only if at the time of each Permitted Payment and both before and after giving effect thereto (a) no Default or Event of Default under the Senior Credit Agreement shall have occurred and be continuing, and (b) the members of the Borrowing Group will remain in compliance with the covenants set forth in Section 5.3 of the Senior Credit Agreement . . . .

Subordination Agreement at § 2 (emphasis added).

31.     Thus, the occurrence of an Event of Default meant that the Borrowing Group could not make, and the Subordinated Lenders could not receive, either directly or indirectly, any dividend distributions.

## C.     Events Of Default Under The Senior Credit Agreement.

32.     Per the terms of the Senior Credit Agreement, Pleasant Hill's authority to obtain credit under the Revolving Loan was contingent, among other things, upon its compliance with various covenants, and Pleasant Hill's "Available Commitment" was limited by certain "Borrowing Base" formulas.  Moreover, it was an automatic default under the Senior Credit Agreement for Pleasant Hill's "Senior Unsecured Debt" (as defined therein) to exceed the Borrowing Base – no notice or declaration of default was required.  *See* Senior Credit Agreement at § 6.1(a)(i).  Thus, to ensure that the Senior Unsecured Debt did not exceed the Borrowing Base, the Borrower was required to calculate and determine the Borrowing Base by applying certain advance rates applicable to "Eligible Assets" in accordance with Section 2.20.2 of the Senior Credit Agreement, and then apply the various Borrowing Base limitations contained in Sections 2.20.3 through 2.20.9.  In particular, Section 2.20.9(a) of the Senior Credit Agreement provided that "[a]t no time shall the sum of the Borrowing Base value attributable to Entitled Land, Lots Under Development, and Finished Lots exceed sixty percent (60%) of the entire

Borrowing Base at the time of determination." This limitation is referred to herein as the "60% Limitation."

33.     Once these calculations were made by the Borrowing Group, the Borrowing Group was required to furnish, or cause to be furnished, to JPMorgan, "[a]s soon as available, . . . a Borrowing Base Certificate reflecting the Borrowing Base as of the end of such month . . . ." *See* Senior Credit Agreement at § 5.1.6.  These Borrowing Base Certificates required the Borrower to certify that: (a) all information contained in the Borrowing Base and Inventory Report was true and correct and calculated in accordance with the definitions as required in the Senior Credit Agreement; (b) the Borrower was in compliance with all covenants set forth in the Senior Credit Agreement; (c) no Event of Default existed under the Senior Credit Agreement; and (d) all representations and warranties were true and correct in all material respects.  Thus, to accurately state the Borrowing Base and to comply with the Borrowing Group's obligation to submit accurate Borrowing Base Certificates, the 60% Limitation was required to be applied in connection with submission of these certificates to JPMorgan.

34.     Despite these covenants and limitations, at all times prior to October 2007, the Borrowing Group (including Pleasant Hill and Woodside Group) failed to apply the 60% Limitation when performing their Borrowing Base calculations.  As a result, beginning at least as early as November of 2006, and continuing through September of 2007, each of the Borrowing Base Certificates submitted by the Borrower to JPMorgan misrepresented the Borrowing Base by failing to include the 60% Limitation, thus significantly overstating the "Total Allowable Borrowing."  These misrepresentations and false certifications contained in the Borrowing Base

Certificates constituted Events of Default under the Senior Credit Agreement. *See* Senior Credit Agreement at § 7.1.3.[7]

35.     In addition, due to the Borrowing Group's failure to account for the 60% Limitation, the Borrowing Group, in contravention of Section 6.1(a) of the Senior Credit Agreement (discussed above), caused the total Senior Unsecured Debt to exceed the maximum allowable Borrowing Base value. Thus, as of January 31, 2007, the Borrower was approximately $78 million overdrawn under the Total Allowable Borrowing. This violation by the Borrower of the negative covenant contained in Section 6.1(a) of the Senior Credit Agreement continued through September 2007, thus resulting in additional Events of Default under Section 7.1.4 of the Senior Credit Agreement. The Borrowing Group and Plaintiffs knew or should have known of these various defaults.

**D.     The Unlawful Dividend Distributions.**

36.     Despite these defaults, and while these defaults were ongoing under the Senior Credit Agreement, the Plaintiffs caused Woodside Group/Pleasant Hill to distribute over $60 million in Dividends to or for the benefit of themselves and their Family Trusts – all in violation of the Subordination Agreement given the Events of Default under the Senior Credit Agreement. Specifically, Woodside Group/Pleasant Hill declared and distributed in excess of $18 million in Dividends to the Family Trusts – the beneficiaries, successors and/or assigns of which include the Counter-Defendants. According to Woodside's general ledger, the following prohibited

---

[7] Similar misrepresentations were made by the Borrower in its Borrowing Requests and Certificates of Compliance that were submitted to JPMorgan from November 2006 through September 2007, thus constituting additional Events of Default.

payments were made by Woodside Group and Pleasant Hill and received by the Plaintiffs and Counter-Defendants in 2007:[8]

| Plaintiffs/Counter-Defendants | 1st Jan. '07 | 2nd Jan. '07 | Apr. '07 | June '07 | Sept. '07 | 2007 YTD |
|---|---|---|---|---|---|---|
| Leonard Arave | $124,933 | $87,075 | $165,063 | $132,505 | $113,576 | $623,151 |
| Jessica Nilson Trust | $637,275 | $444,162 | $837,970 | $676,527 | $579,881 | $3,175,816 |
| Nellie Joe Nilson Trust | $558,769 | $389,445 | $734,246 | $593,262 | $508,511 | $2,794,233 |
| Brett Nilson Trust | $618,339 | $430,964 | $812,950 | $656,443 | $562,665 | $3,081,361 |
| Abby Nilson Trust | $646,477 | $450,575 | $850,126 | $686,285 | $588,245 | $3,221,707 |
| Joy Nilson Trust | $627,110 | $437,083 | $824,550 | $665,754 | $570,647 | $3,125,152 |
| Benjamin Ezra Nilson Trust | $630,894 | $439,714 | $831,674 | $669,130 | $573,540 | $3,144,952 |
| Ezra K. Nilson | $7,512,734 | $5,236,146 | $9,936,868 | $7,966,480 | $6,828,411 | $37,480,640 |
| Scott Nelson | $714,310 | $497,852 | $943,755 | $757,601.25 | $649,372.50 | $3,562,890.45 |
| **TOTAL** | | | | | | **$60,209.902.45** |

37.     Because the above Dividends were declared and/or distributed while an Event of Default occurred and was continuing under the Senior Credit Agreement, both Plaintiffs and certain Counter-Defendants, as the heirs, legal representatives, successors and/or assigns to certain of the Subordinated Lenders under the Subordination Agreement and as beneficiaries, successors and/or assigns of certain of the Family Trusts, were required to hold such funds in trust and to immediately deliver such funds to JPMorgan, as Administrative Agent.  Specifically, the Subordination Agreement provides:

> **Delivery of Payments**.  In the event that notwithstanding this Agreement, any
> payment or distribution of assets of the members of the [Woodside] Group or any

---

[8] According to Plaintiffs' testimony and that of Woodside's controller, the beneficiaries of each of the Family Trusts identified in the below table actually received these payments.

of their Subsidiaries of any kind or character, whether in cash, property, or securities, from any source whatsoever shall be received by Subordinated Lender contrary to the provisions of this Agreement, <u>such payment or distribution shall be held in trust for the benefit of and shall be immediately paid or delivered (with all necessary endorsements) by such holder to the Administrative Agent</u>, for application to the payment or prepayment of all such Specified Senior Debt remaining unpaid, to the extent necessary to pay all such Specified Senior Debt in full in cash after giving effect to any other concurrent payment or distribution to the Senior Lenders.

*See* Subordination Agreement at § 3 (emphasis added).

38.     Despite the express terms of the Subordination Agreement, the Plaintiffs and Counter-Defendants never held the above monies in trust or delivered them to JPMorgan notwithstanding the Event of Default under the Senior Credit Agreement.   Rather, on information and belief, the Plaintiffs and Counter-Defendants spent these funds, in large part, to pay certain taxes owed.

**E.     The Counter-Defendant Beneficiaries Are Bound By The Subordination Agreement And Have Received Improper Benefits.**

39.     Counter-Defendants Benjamin Nilson, Abby Crockett, Brett Ure, Jessica Cosgrave, Joy Haywood and Nellie Pugsley (collectively, the "<u>Trust Beneficiaries</u>") are (i) the heirs, legal representatives, successors and/or assigns to certain of the Subordinated Lenders under the Subordination Agreement, and/or (ii) beneficiaries, successors and/or assigns of the Family Trusts, as detailed above.   As such, the Trust Beneficiaries are bound by the Subordination Agreement and the obligations thereunder.   Specifically, paragraph 19 of the Subordination Agreement provides:

**Binding Effect, Acceptance.**   <u>This agreement shall be binding upon Subordinated Lender and its heirs, legal representatives, successors and assigns</u> and shall inure to the benefit of the Senior Lenders and their participants, successors and assigns irrespective of whether this or any similar agreement is executed by any other creditor of the members of the Borrowing Group.   All words used herein in the

singular shall be deemed to have been used in the plural where the context so requires. Notice of acceptance by the Senior Lenders of this Agreement or of reliance by the Senior Lenders upon this Agreement is hereby waived by the Subordinated Lender. The terms of this Agreement shall continue in effect until all Specified Senior Debt has been indefeasibly paid in full, in cash, all obligations of Administrative Agent and Senior Lenders to make loans and otherwise extend credit to or for the benefit of the members of the Borrowing Group pursuant to the Senior Credit Agreement have expired and terminated, all letters of credit issued pursuant to the Senior Credit Agreement have expired or been terminated and all obligations of any Senior Lender to issue additional letters of credit pursuant to the Senior Credit Agreement have terminated or expired and notwithstanding any such payment, termination or expiration, the terms of this Subordination Agreement shall be reinstated if at any time any payments to the Administrative Agent or Senior Lenders are rescinded or otherwise must be returned upon the Borrower's insolvency, bankruptcy, reorganization or otherwise.

*See* Subordination Agreement at § 19 (emphasis added).

40. Moreover, on information and belief, the spouses of the Trust Beneficiaries – including David Crockett, Seth Ure, Michael Cosgrave, and Nate Pugsley (collectively, the "Spouse Beneficiaries") – had shared control of bank and/or investment accounts where the various wrongful Dividend distributions from Woodside and Pleasant Hill to the Family Trusts were made, and where certain Tax Refunds (described below) have been deposited. On further information and belief, these improper Dividends distributed to the Family Trusts have been commingled with other funds of both the Trust Beneficiaries and the Spouse Beneficiaries. As such, the Spouse Beneficiaries have received improper benefits through their use and enjoyment of the Dividend distributions that were wrongfully declared and paid to the Family Trusts (and thus, to the Trust Beneficiaries), in violation of the Subordination Agreement due to the continuing Event of Default under the Senior Credit Agreement.

**F.      The Forbearance Agreements.**

41.      On October 24, 2007, after JPMorgan and the Bank Group learned of the above Events of Default, Pleasant Hill, Woodside Group and JPMorgan, among others, entered into a forbearance agreement (the "First Forbearance Agreement"). A second forbearance agreement was executed on December 19, 2007 (the "Second Forbearance Agreement") (collectively, the "Forbearance Agreements").

42.      As provided in the Forbearance Agreements, Pleasant Hill admitted that certain Events of Default had occurred under the Senior Credit Agreement. In particular, in the Forbearance Agreements, Pleasant Hill acknowledged:

> [Pleasant Hill] has failed to comply with the covenants required under Sections 2.20.9(a) and 6.1(a) of the [Senior] Credit Agreement. The foregoing constitute Defaults or Events of Default under the [Senior] Credit Agreement, which potentially create defaults and events of defaults under other Obligations of the Borrowing Group and consequently cause an Event of Default under Section 7.1.7 of the [Senior] Credit Agreement (such Defaults and Events of Default are collectively referred to herein as the "Existing Defaults"), without any cure or grace periods.

*See* Forbearance Agreements at ¶ C.   The Forbearance Agreements also confirmed that JPMorgan and the Bank Group were "entitled to, among other things, enforce their rights and remedies under the Senior Credit Agreement and otherwise at law or equity." *Id.* at ¶ D. The ability of JPMorgan and the Bank Group to enforce these rights and remedies was expressly preserved, and Pleasant Hill expressly and unequivocally released JPMorgan and each member of the Bank Group from any and all potential liability. *See* First Forbearance Agreement at ¶¶ 3, 9(b); Second Forbearance Agreement at ¶¶ 7, 15(b).

**G.     Conversion Of The Woodside Entities And The Resulting Tax Refunds.**

43.     As a subchapter S corporation, income generated by Woodside was "passed through" and attributed to its shareholders for tax purposes.  Thus, Woodside Group/Pleasant Hill paid quarterly dividends to its shareholders (*i.e.*, the Plaintiffs and Counter-Defendants) for the primary purpose of allowing shareholders to satisfy their tax obligations with respect to Woodside income.  Many shareholders also received dividend payments that were materially above their tax liabilities.  In fact, on information and belief, from 2006 through 2007, Woodside Group/Pleasant Hill distributed over $234 million in shareholder dividends.

44.     On July 25, 2008, ignoring any corporate formalities, and without informing JPMorgan or any member of the Bank Group or obtaining the consent of JPMorgan or any member of the Bank Group, the Plaintiffs approved and effectuated a Plan of Conversion whereby: (1) Woodside Group, Inc. converted from a Nevada subchapter S-corporation into Woodside Group, LLC, a Nevada limited liability company; (2) more than 100 subchapter-S subsidiaries of Woodside were merged into at least ten new limited liability companies or partnerships; and (3) another thirteen corporations affiliated with Woodside were converted into limited liability companies (collectively, the "Tax Conversion").

45.     Because this Tax Conversion constituted a liquidation for tax purposes of Woodside's assets at a time when the assets had a value significantly lower than Woodside's tax basis in those assets, the Tax Conversion created significant tax losses that flowed through to Woodside's shareholders due to the "pass-through" nature of the subchapter S-corporations.  As such, the shareholders were permitted to "carry back" the tax losses created by the Tax Conversion against income that was earned in 2006 and 2007.  In fact, on information and belief,

the Tax Conversion triggered in excess of $500 million in losses that could be carried back, thereby generating approximately $110 million in federal tax refunds, in addition to any potential state tax refunds (collectively, the "Tax Refunds"), of payments made by Pleasant Hill to taxing authorities for the purpose of paying the shareholders' personal tax liabilities.[9]

46.     Thus, these Tax Refunds are inextricably linked to the wrongful distributions at issue because they: i) are in large part a return of monies wrongfully paid by Woodside Group/Pleasant Hill to Plaintiffs in violation of the Subordination Agreement; and ii) result from a Tax Conversion that was secretly and improperly effectuated in breach of the Senior Credit Agreement.  As a result, the Defendants/Counter-Plaintiffs have a strong interest in these funds. In this regard, Plaintiffs and the Counter-Defendants have or will receive in excess of $60 million of this $110 million in Tax Refunds.  In particular, on information and belief:

(a)     Mr. Ezra Nilson received federal tax refunds totaling $58,927,324.  Mr. Nilson has also applied for but has yet to receive state tax refunds in the following amounts:  Arizona – $435,961 and $14,190; Maryland – $43,007 and $0 (not applied for); Minnesota – $141,882 and $1,730; Utah – $740,689 and $13,889; and Virginia – $73,587 and $0 (not applied for).

(b)     Mr. Arave received federal tax refunds totaling $1,231,778.  Mr. Arave has also received, or has applied for but has yet to receive state tax refunds in the following amounts:  Arizona – $4,378.00 and $0; Maryland – $549.00 and $0; Minnesota – $1,974.00 and $0; Utah – $129,645.00 and $40,503.00; and Virginia – $791.00 and $0.

(c)     Mr. Nelson has applied for, but has yet to receive federal tax refunds of $5,411,829.  Mr. Nelson has also received, or applied for but has yet to receive state tax refunds in the following amounts:  Arizona – $32,802 and $624; Maryland – $3,489 and $0 (not applied for); Minnesota – $11,583 and $0 (not applied for); Utah – $602,620 and $215,469; and Virginia – $5,947 and $0 (not applied for).

---

[9] On information and belief, the Plaintiffs and Counter-Defendants will likely receive substantial additional Tax Refunds in the future as a result of this same Tax Conversion due to a change in law permitting the Plaintiffs and Counter-Defendants the ability to carry-back tax losses further.  All such tax refunds are collectively referred to herein as the "Tax Refunds."

(d)     Mr. Benjamin Nilson received federal tax refunds totaling $3,961,979. Mr. Nilson has also received, or has applied for but has yet to receive state tax refunds in the following amounts:  Arizona – $30,421 and $611; Maryland – $3,074 and $0; Minnesota – $10,127 and $0; Utah – $402,571 and $1,681; Virginia – $4,995 and $0.

(e)     Mr. and Mrs. Andrew Haywood have received, or have applied for but have yet to receive tax refunds in the following amounts:  1) federal tax refunds in the amounts of $3,182,845.00 and $690,636.00; and 2) state tax refunds in the following amounts:  Arizona – $31,852.00 and $530.00; Maryland – $3,073.00 and $0; Minnesota – $10,090.00 and $0; Utah – $411,328.00 and $144,532.00; and Virginia – $4,973.00 and $0.  Mr. and Mrs. Andrew Haywood have already received $4,323,265.00 of the above amounts.

(f)     Mr. and Mrs. Nathan Pugsley have received, or have applied for but have yet to receive tax refunds in the following amounts:  1) federal tax refunds in the amounts of $3,023,652.00 and $645,772.00; and 2) state tax refunds in the following amounts:  Arizona – $25,376.00 and $450.00; Maryland – $2,686.00 and $0; Minnesota – $9,119.00 and $0; Utah – $397,095.00 and $137,832.00; and Virginia – $4,698.00 and $0.  Mr. and Mrs. Nathan Pugsley have already received $4,237,552.00 of the above amounts.

(g)     Mr. and Mrs. Michael Cosgrave have received, or have applied for but have yet to receive tax refunds in the following amounts:  1) federal tax refunds in the amounts of $3,411,975.00 and $780,975.00; and 2) state tax refunds in the following amounts:  Arizona – $35,714.00 and $494.00; Maryland – $3,092.00 and $0; Minnesota – $10,657.00 and $0; Utah – $53,653.00 and $226.00; and Virginia – $5,076.00 and $0.  Mr. and Mrs. Michael Cosgrave have already received approximately $4,298,270.00 of the above amounts.

(h)     While the Ures and Crocketts have likely also received and/or applied for tax refunds in similar amounts, Defendants are without specific knowledge of the amounts and timing of these requests/payments.

47.     The above Tax Refunds likely serve as the only funds that will enable the Plaintiffs and Counter-Defendants to satisfy any judgment in this case.

## H.     The Utah District Court Proceeding.

48.     As a result of the above wrongful conduct, on September 3, 2009, JPMorgan sent certain Woodside shareholders a demand letter (the "Demand Letter") reminding them of the

Subordination Agreement's terms, obligations and stipulated remedies, and demanding that the shareholders comply with the Subordination Agreement by delivering certain wrongfully obtained funds to JPMorgan, and/or by holding such funds in constructive trust.  JPMorgan's Demand Letter also requested that the shareholders not transfer or otherwise disseminate the Tax Refunds.

49.     Rather than respond to the Demand Letter, on September 9, 2009, the Plaintiffs filed a Complaint (the "Complaint") against JPMorgan and others for declaratory relief in the Second Judicial District Court for Davis County, Utah, Civil Cause No. 090700622 (the "State Court Proceeding").  That State Court Proceeding was subsequently removed by JPMorgan to this Court on September 17, 2009 (the "Utah District Court Proceeding").

I.     **Court Proceedings.**

50.     On September 23, 2009, JPMorgan filed its *Answer, Counterclaims For Relief And Request For Preliminary Injunction* (the "Answer") in the Utah District Court Proceeding. Therein, JPMorgan asserted various counterclaims against the Plaintiffs due to the Plaintiffs' receipt of certain dividends that were issued by Woodside Group/Pleasant Hill when an Event of Default existed under the Senior Credit Agreement.  Subsequently, each member of the Bank Group filed an answer, counterclaims for relief and requests for a preliminary injunction asserting substantially similar counterclaims as JPMorgan.

51.     Contemporaneously with the filing of its Answer, on September 23, 2009, JPMorgan filed its Motion for Preliminary Injunction.  All other Defendants subsequently joined in the Motion for Preliminary Injunction.

**J.      The Preliminary Injunction Hearing.**

52.      From November 18, 2009 through November 20, 2009, the Court held a hearing on JPMorgan's Motion for Preliminary Injunction (the "Preliminary Injunction Hearing"). Based upon the evidence presented at the Preliminary Injunction Hearing, on December 23, 2009, the Court entered its *Findings Of Fact, Conclusions Of Law, And Memorandum Decision And Order Granting Preliminary Injunction* (the "Preliminary Injunction Order") thereby restraining and enjoining

> Plaintiffs Nilson and Arave, and all those acting in concert with them, including all heirs, legal representatives, successors and assigns, from disseminating, transferring and/or otherwise disposing of or spending any of the Tax Refunds already received or to be received, in an amount equal to all distributions made by the Woodside Group, LLC (or its predecessor entity), Pleasant Hill Investments, LC, and other members of the Borrowing Group, including any "loan re-payments" made by Alameda Investments (Delaware), LLC or Liberty Holding Group, LLC, directly or indirectly, to or for the benefit of Plaintiffs in the calendar year 2007.

Preliminary Injunction Order at p. 54.

## FIRST COUNTERCLAIM FOR RELIEF
### AGAINST TRUST BENEFICIARIES
### (BREACH OF SUBORDINATION AGREEMENT)

53.      Counter-Plaintiffs repeat and re-allege paragraphs 1-52 and incorporate them by reference as though fully set forth herein.

54.      JPMorgan and the Senior Lenders have at all times performed under the Subordination Agreement.

55.      In accepting and retaining the Dividends made to or for the benefit of the Family Trusts by Woodside and Pleasant Hill while an Event of Default existed under the Senior Credit Agreement, the Trust Beneficiaries, as the heirs, legal representatives, successors and/or

assigns to certain of the Subordinated Lenders under the Subordination Agreement and/or as beneficiaries, successors and/or assigns of certain of the Family Trusts, have breached the Subordination Agreement.

56.     Because there were defaults under the Senior Credit Agreement when the Dividends at issue were made by the Woodside Group/Pleasant Hill, the Dividends were not "Permitted Payments" under the Subordination Agreement and thus were accepted and received in breach of the Subordination Agreement.

57.     Critically, after the Trust Beneficiaries wrongfully accepted the above-described Dividends, they failed to either hold such payments in trust or immediately pay or deliver such payments to JPMorgan, the Administrative Agent, as required by the Subordination Agreement.

58.     As a result of these continuing breaches of the Subordination Agreement, Counter-Plaintiffs have sustained actual damages in an amount to be determined at trial, but in any event, in excess of the minimum jurisdictional limits of this Court.

59.     Counter-Plaintiffs are entitled to an award of its attorneys' fees and costs pursuant to Section 17 of the Subordination Agreement.

## SECOND COUNTERCLAIM FOR RELIEF
### AGAINST TRUST BENEFICIARIES
### (SPECIFIC PERFORMANCE)

60.     Counter-Plaintiffs repeat and re-allege paragraphs 1-59 and incorporate them by reference as though fully set forth herein.

61.     In addition and in the alternative, Section 14 of the Subordination Agreement provides for certain remedies available in the event of a breach:

4815-2441-9845.1

**Breach of Agreement by Borrowing Group or Subordinated Lender.** In the event of any breach of this Agreement by the members of the Borrowing Group or Subordinated Lender, then and at any time thereafter and in addition to all other rights and remedies of the Administrative Agent and Senior Lenders, the Administrative Agent shall have the right to declare immediately due and payable all or any portion of the Specified Senior Debt without presentment, demand, protest or notice of dishonor, all of which are hereby expressly waived by the members of the Borrowing Group and Subordinated Lender. In addition, Administrative Agent and Senior Lenders shall be entitled to equitable relief, including without limitation specific performance, in order to enforce this Agreement and Subordinated Lender waives any claims that Administrative Agent and Senior Lenders are not entitled to such relief, including, without limitation, that there is an adequate legal remedy. No delay, failure or discontinuance of the Administrative Agent or any Senior Lender in exercising any right, privilege, power or remedy hereunder shall be deemed a waiver of such right, privilege, power or remedy; nor shall any single or partial exercise of any such right, privilege, power or remedy preclude, waive or otherwise affect the further exercise thereof or the exercise of any other right, privilege, power or remedy.

62.     As indicated above, when the Trust Beneficiaries, as the heirs, legal representatives, successors and/or assigns to certain of the Subordinated Lenders under the Subordination Agreement and/or as beneficiaries, successors and/or assigns of certain of the Family Trusts, wrongfully accepted the Dividends at issue through their respective Family Trusts, they breached the Subordination Agreement and their express trust obligation to the Administrative Agent.

63.     On its face, the Subordination Agreement (a contract negotiated by two sophisticated parties in an arm's length transaction) provides for specific performance. Specifically, pursuant to the terms of the Subordination Agreement, the Administrative Agent is entitled to a judgment requiring the Trust Beneficiaries to specifically perform their obligation to turn over to the Administrative Agent all funds they received in breach of the Subordination Agreement.

64.    Moreover, the Trust Beneficiaries waived any argument that the Defendants/Counter-Plaintiffs had an adequate remedy at law.  As such, the equitable remedy of specific performance is appropriate and warranted.

65.    As stated above, Counter-Plaintiffs have no adequate remedy at law.  Only through the exercise of the Court's equitable powers to enforce specific performance can Counter-Plaintiffs be fully protected from the immediate and irreparable injury which the Trust Beneficiaries' ongoing actions have inflicted.

66.    In addition to an order of specific performance, Counter-Plaintiffs are entitled to an award of its attorneys' fees and costs pursuant to Section 17 of the Subordination Agreement.

### THIRD COUNTERCLAIM FOR RELIEF
### AGAINST TRUST BENEFICIARIES AND SPOUSE BENEFICIARIES
### (UNJUST ENRICHMENT)

67.    Counter-Plaintiffs repeat and re-allege paragraphs 1-66 and incorporate them by reference as though fully set forth herein.

68.    In violation of the express terms of the Subordination Agreement, all of the Counter-Defendants, including the Trust Beneficiaries and the Spouse Beneficiaries, received and/or accepted the improper and wrongful Dividends that were declared and/or paid by Woodside Group/Pleasant Hill while an Event of Default existed under the Senior Credit Agreement.  These Dividends and the acceptance thereof conferred improper benefits on all the named Counter-Defendants.

69.    All Counter-Defendants knew, or should have known, that their receipt of these benefits was contrary to the fundamental principles of equity and good conscience.

Page 25 of

70.     Permitting Counter-Defendants to retain the benefits conferred upon them would be inequitable.

71.     Counter-Plaintiffs have been damaged by the Counter-Defendants' actions and have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Counter-Plaintiffs be fully protected from further imminent and irreparable harm which Counter-Defendants' actions threaten to inflict.

72.     Counter-Plaintiffs are entitled to recover the value of the benefits wrongfully conferred upon, and/or retained by, Counter-Defendants in an amount to be determined at trial.

### FOURTH COUNTERCLAIM FOR RELIEF
AGAINST TRUST BENEFICIARIES AND SPOUSE BENEFICIARIES
(COMMON LAW CONSTRUCTIVE TRUST)

73.     Counter-Plaintiffs repeat and re-allege paragraphs 1-72 and incorporate them by reference as though fully set forth herein.

74.     The actions of all Counter-Defendants, including the Trust Beneficiaries and Spouse Beneficiaries, entitle Counter-Plaintiffs to a judgment imposing a constructive trust under Utah law, by which the Subordination Agreement is governed and under which it must be construed.  Specifically, the Counter-Plaintiffs request that a constructive trust be imposed over the monies that were wrongfully received, accepted and/or retained by the Counter-Defendants from Woodside Group/Pleasant Hill while an Event of Default existed under the Senior Credit Agreement, thereby violating Section 2 of the Subordination Agreement (described above).

75.     Counter-Defendants have been and continue to be unjustly enriched as a result of their wrongful conduct, including their acceptance of and failure and refusal to return the Tax Refunds that rightfully belong to the Counter-Plaintiffs.

76.     The specific Tax Refunds received by the Counter-Defendants can be directly traced to the wrongful behavior of the Counter-Defendants, as more specifically described above.

77.     On information and belief, in addition to the Trust Beneficiaries' improper receipt of the Dividends and Tax Refunds, the Spouse Beneficiaries had access to and/or shared control of bank and/or investment accounts where the various Dividend distributions from Woodside Group/Pleasant Hill to the Family Trusts were made, and where certain Tax Refunds have been deposited.  As such, the Spouse Beneficiaries were also unjustly enriched by the Dividends and Tax Refunds, and should be required to hold such disputed monies in trust.  All Counter-Defendants, however, have failed to hold such funds in trust.

78.     Counter-Plaintiffs have no adequate remedy at law to protect them from Counter-Defendants' wrongful conduct and, as such, the Court should exercise its equitable powers and impose a constructive trust on the funds that belong to the Counter-Plaintiffs that are currently retained by the Counter-Defendants in breach of their express trust obligation.

**FIFTH COUNTERCLAIM FOR RELIEF**
(AGAINST TRUST BENEFICIARIES)
CONTRACTUAL CONSTRUCTIVE TRUST

79.     Counter-Plaintiffs repeat and re-allege paragraphs 1-78 and incorporate them by reference as though fully set forth herein.

80.     Section 3 of the Subordination Agreement specifically requires the Counter-Defendant Trust Beneficiaries, as the heirs, legal representatives, successors and/or assigns to certain of the Subordinated Lenders under the Subordination Agreement and/or as beneficiaries, successors and/or assigns of certain of the Family Trusts, to hold the wrongful Dividends in trust, and Counter-Defendant Trust Beneficiaries failed, and continue to fail, to do so.

81.     Counter-Plaintiffs have no adequate remedy at law to protect them from the Counter-Defendant Trust Beneficiaries' wrongful conduct and, as such, the Court should exercise its equitable powers and impose a constructive trust on the funds that belong to the Counter-Plaintiffs that are currently retained by the Counter-Defendant Trust Beneficiaries in breach of their express trust obligation.

**SIXTH COUNTERCLAIM FOR RELIEF**
AGAINST TRUST BENEFICIARIES AND SPOUSE BENEFICIARIES
(PERMANENT INJUNCTION)

82.     Counter-Plaintiffs repeat and re-allege paragraphs 1-81 and incorporate them by reference as though fully set forth herein.

83.     As mentioned above, the Court has already granted JPMorgan's and the Bank Group's preliminary injunction as to Messrs. Nilson and Arave, finding that the Counter-Plaintiffs had satisfied the preliminary injunction standard.  In this Counterclaim, Counter-Plaintiffs seek similar relief, and request that a permanent injunction be issued against the Counter-Defendants with respect to any Tax Refunds received or to be received until such time that any adverse judgment against the Counter-Defendants is satisfied.  Such relief is appropriate given that these Tax Refunds are inextricably linked to the wrongful distributions at issue because they: i) are in large part a return of monies wrongfully paid by Woodside Group/Pleasant Hill to Plaintiffs (including the Family Trusts) in violation of the Subordination Agreement; and ii) result from a Tax Conversion that was secretly and improperly effectuated in breach of the Senior Credit Agreement.  As a result, the Defendants/Counter-Plaintiffs have a strong equitable interest in these funds.

84.     In particular, until any judgment against the Counter-Defendants is satisfied in full, Counter-Plaintiffs will suffer irreparable injury if the Counter-Defendants, and all those acting in concert with them, including all heirs, legal representatives, successors and assigns, are not enjoined and restrained from disseminating, transferring and/or otherwise disposing of or spending any of the Tax Refunds already received or to be received, in an amount equal to any judgment entered against the Counter-Defendants.  The irreparable harm described herein is equitable in nature and demonstrated by, among other things:  (i) the Counter-Defendants' failure to deliver the wrongfully transferred funds to JPMorgan, as Administrative Agent; (ii) the Counter-Defendants' failure to hold such funds in trust for the Defendants/Counter-Plaintiffs; and (iii) the Counter-Defendants' failure to confirm to JPMorgan, as Administrative Agent, that they will not disseminate and/or otherwise transfer the Tax Refunds pending resolution and full satisfaction of any adverse judgment in this case.  The risk of irreparable injury is heightened considering the fact that the Counter-Defendants are individuals not normally in possession of surplus cash in an amount that would adequately compensate Defendants/Counter-Plaintiffs for their damages.  As such, absent a permanent injunction, the Counter-Plaintiffs are left without any assurances that the Counter-Defendants will be able to fully satisfy and discharge any adverse judgment.

85.     The continuing and threatened harm to Counter-Plaintiffs outweighs the harm a permanent injunction would cause to Counter-Defendants because (i) the permanent injunction would only take effect upon a finding of liability on behalf of the Counter-Defendants; (ii) the permanent injunction would only enjoin the Tax Refunds in an amount sufficient to fully satisfy and discharge any adverse judgment; and (iii) the permanent injunction would lapse upon the full

and complete satisfaction by the Counter-Defendants of any adverse judgment.  As such, no harm would be caused to the Counter-Defendants.  To the contrary, if a permanent injunction is not issued, there is a significant and substantial risk that the Counter-Defendants would not have sufficient funds available to satisfy any adverse judgment and/or that the Counter-Defendants will disseminate, transfer and/or otherwise dispose of or spend current and future Tax Refunds for purposes other than satisfying an adverse judgment. Thus, if the Tax Refunds are not permanently enjoined, it is likely that the Counter-Plaintiffs will never be adequately compensated.

86.    As such, there is no adequate remedy at law, and the threatened harm to Counter-Plaintiffs far outweighs the minimal burden that a permanent injunction, pending satisfaction of a judgment against them, would place on the Counter-Defendants.

87.    Because the permanent injunction (i) would only take effect upon a finding of liability on behalf of the Counter-Defendants; (ii) would only enjoin the Tax Refunds in an amount sufficient to satisfy and discharge any adverse judgment; and (iii) would lapse upon the full and complete satisfaction by the Counter-Defendants of any adverse judgment, such relief would not adversely affect the public interest.  To the contrary, such relief would be in furtherance of public policy as it would ensure that the Counter-Defendants would be able to satisfy and discharge any adverse judgment, thereby preserving and protecting the rights and obligations to which the Plaintiffs (including the Family Trusts) and Counter-Plaintiffs agreed to be bound in the Subordination Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against the Counter-Defendant Trust Beneficiaries on their First Counterclaim for Relief as follows:

1. For damages in an amount to be proven by dispositive motion or at trial;

2. For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement and other applicable law; and

3. For such other and further relief as the Court deems just and equitable in the premises.

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against the Counter-Defendant Trust Beneficiaries on their Second Counterclaim for Relief as follows:

1. For an order directing the Counter-Defendant Trust Beneficiaries to pay JPMorgan an amount equal to the value of the Dividends and other distributions wrongfully retained by the Counter-Defendants in an amount to be determined by dispositive motion or at trial;

2. For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement and applicable law; and

3. For such other and further relief as the Court deems just and equitable in the premises.

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against all of the Counter-Defendants on their Third Counterclaim for Relief as follows:

1. For an order compelling all of the Counter-Defendants to pay Counter-Plaintiffs an amount equal to the value of the benefits wrongfully retained by the Counter-Defendants in an amount to be determined by dispositive motion or at trial;

2. For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement; and

3. For such other and further relief as the Court deems just and equitable in the premises.

Page 31 of

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against all of the

Counter-Defendants on their Fourth Counterclaim for Relief as follows:

1.    For an order imposing a constructive trust upon all proceeds distributed to, or received by, all of the Counter-Defendants in violation of the terms of the Subordination Agreement in an amount to be proven by dispositive motion or at trial;

2.    For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement; and

3.    For such other and further relief as the Court deems just and equitable in the premises.

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against the

Counter-Defendant Trust Beneficiaries on their Fifth Counterclaim for Relief as follows:

1.    For an order imposing a constructive trust upon all proceeds distributed to, or received by, the Counter-Defendant Trust Beneficiaries in violation of the terms of the Subordination Agreement in an amount to be proven by dispositive motion or at trial;

2.    For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement; and

3.    For such other and further relief as the Court deems just and equitable in the premises.

WHEREFORE, Counter-Plaintiffs pray for judgment in their favor and against all of the

Counter-Defendants on their Sixth Counterclaim for Relief as follows:

1.    For an order compelling Counter-Defendants to pay JPMorgan an amount equal to the value of the Dividends and other distributions wrongfully retained by the Counter-Defendants in an amount to be determined by dispositive motion or at trial;

2.    For an order permanently enjoining Counter-Defendants, and all those acting in concert with them, including all heirs, legal representatives, successors and assigns, from disseminating, transferring and/or otherwise disposing of or spending any of the Tax Refunds already received or to be received, until such time that any judgment entered against the Counter-Defendants is satisfied;

Page 32 of

3.    For reasonable attorneys' fees and costs as provided for pursuant to Section 17 of the Subordination Agreement; and

4.    For such other and further relief as the Court deems just and equitable in the premises.

DATED this 17th day of May 2010.

_____
SHANE D. HILLMAN
PARSONS BEHLE & LATIMER

RICHARD S. KRUMHOLZ
KRISTIN R. TURNER
REBECCA O. MILNE
FULBRIGHT & JAWORSKI L.L.P.
Admitted *Pro Hac Vice*

Attorneys for JPMorgan Chase Bank, N.A., Individually and as Administrative Agent

DATED this 17th day of May 2010.

_____
ANNETTE JARVIS
CAMERON HANCOCK
PEGGY HUNT
DORSEY & WHITNEY LLP

Attorneys for Wells Fargo Bank, N.A., Wachovia Bank, N.A., and U.S. Bank National Association